906 So.2d 81 (2004)
Brenda BYNUM, Appellant
v.
MISSISSIPPI DEPARTMENT OF EDUCATION, Appellee.
No. 2003-SA-01690-COA.
Court of Appeals of Mississippi.
December 7, 2004.
Rehearing Denied March 29, 2005.
Certiorari Denied June 23, 2005.
*87 Ashley E. Cannady, Kathy K. Smith, John G. Corlew, Jackson, attorneys for appellant.
Tara P. Ellis, Armin J. Moeller, Jr., Jackson, attorneys for appellee.
Before KING, C.J., MYERS and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. On February 17, 2000, the Mississippi Department of Education terminated Brenda Bynum from her position as an educational specialist senior. Bynum appealed, and the Employee Appeals Board reinstated her. On certiorari review, the Circuit Court for the First Judicial District of Hinds County reversed the decision of the EAB. In this appeal, Bynum argues that the EAB's decision to reinstate her was supported by substantial evidence and that the circuit court failed to afford proper deference to the EAB's decision.
¶ 2. We hold that certain of the EAB's findings were not supported by substantial evidence and were arbitrary and capricious. Therefore, we affirm the decision of the circuit court reinstating Bynum's termination.

FACTS
¶ 3. MDE hired Bynum as an educational specialist in September 1994 and later promoted her to educational specialist senior. She worked in the Office of Community Development, a bureau headed by her immediate supervisor, Dr. Worth Haynes, the Director of Vocational Community Development. The Office of Community Development administered certain vocational programs.
¶ 4. Bynum's position at MDE required her to exercise judgment. Bynum functioned as the state coordinator of the Work-Based Learning program (WBL), a vocational program piloted in 1994 which helped community college and high school students develop job skills. Bynum performed this function by supervising all aspects of the implementation of WBL at several pilot locations at community colleges, and then on a statewide basis after the pilot stage. Bynum also helped coordinate the Partners-In-Education Construction Initiative Program (CIP), a vocational program piloted in 1996 that focused on providing high school students with the skills necessary to succeed in construction industry jobs. In implementing the programs, Bynum worked with local coordinators at the WBL and CIP sites, but the local coordinators were responsible for purchasing equipment used in the programs.
¶ 5. On May 26, 1999, Dr. Haynes sent a letter to James Sardin, the Associate Superintendent for Vocational Education, recommending that MDE purchase $900,000 worth of computer software for CIP from The Computer Learning Works, Inc. (CLW), a software company based in Starkville, Mississippi. Dr. Haynes collaborated with another bureau head to recommend that MDE use federal funds to purchase an additional $600,000 of CLW software. In spring 1999, Judy Rhodes, *88 the Director of Educational Accountability, became concerned about the recommendation. Rhodes was concerned because the software had never been subjected to competitive bidding, the usual MDE purchasing process in which multiple vendors compete to provide MDE with the best product at the cheapest price. Rhodes initiated an investigation into the planned purchase. During the investigation, Rhodes discovered that all of the CIP pilot sites and WBL sites had purchased CLW software. The software had been purchased for those sites by the sites' local program coordinators.
¶ 6. Effective July 1, 1999, the Mississippi legislature appropriated 1.7 million dollars to fund the expansion of CIP statewide "using the same curriculum and program as developed and piloted by the Department of Education...." H.B. 1636, 1999 Leg., Reg. Sess. (Miss.1999). The bill was enacted into law. On June 7, 1999, Dr. Richard L. Thompson, the State Superintendent of Education, submitted a procurement request to the Mississippi Department of Information Technology Services (ITS) for 1.5 million dollars for a statewide license for CLW software. On July 15, 1999, Dr. Thompson requested that an item be added to the ITS Board's agenda consisting of a purchase approval for $900,000 of CLW software. On July 16, 1999, the State Board of Education approved using $900,000 of the legislative appropriation to buy more of the CLW software already in use at the CIP pilot sites for implementation in the CIP statewide expansion.
¶ 7. MDE became concerned about whether the legislative appropriation required that MDE purchase the CLW software used by the pilot sites, or whether the appropriation allowed MDE to purchase the needed software pursuant to a competitive bidding process. On September 2, 1999, MDE requested an opinion on the matter from the Attorney General. The Attorney General opined that the appropriation did not require MDE to buy the software from CLW. MDE cancelled the CLW purchase and held a bidding contest. Plato, another software company, won the bid after being found to provide the cheapest software that fulfilled MDE's needs. CLW submitted the second best bid.
¶ 8. On September 2, 1999, Dr. Thompson filed a complaint with the Ethics Commission against Bynum concerning her 1995 trip to an American Vocational Association convention and her involvement in the procurement of CLW software for WBL and CIP. The Ethics Commission issued a subpoena duces tecum to Dr. Thompson. The subpoena demanded some documents that were in the possession of Dr. Haynes. Dr. Haynes was given a list of documents he needed to supply, and Bynum helped Dr. Haynes compile the listed documents.
¶ 9. In January 2000, MDE fired Dr. Haynes for numerous policy violations. On January 19, 2000, MDE invited Bynum to a hearing regarding her role in the selection of software for WBL and CIP as well as other aspects of her job performance. On February 15, 2000, a pre-termination conference was held. On February 17, 2000, MDE sent Bynum a termination letter based upon MDE's finding that Bynum had committed offenses within Groups One, Two, and Three as prescribed by the State Personnel Board Policies and Procedures Manual. An employee's commission of a single Group Three offense is grounds for dismissal. S.P.B. Rule 9.10(C) (Rev.1999).
¶ 10. Specifically, the letter alleged that Bynum had in various ways endorsed CLW software in her dealings with the local coordinators of WBL and CIP. The letter stated that Bynum's endorsement of one brand of software was contrary to *89 MDE's policy that MDE "was not to endorse any software and no specific software program was to be required" for WBL and CIP. The letter alleged that Bynum altered a document and falsified a letter in response to the Ethics Commission subpoena. Additionally, the letter stated that Bynum attended the 1995 American Vocational Association conference after MDE had denied permission for her to attend, wore a CLW name tag at the conference, was in CLW's booth, and told someone that she worked for CLW. MDE alleged that, during that trip, Bynum charged personal expenses to her state-issued credit card in violation of MDE policy. MDE stated that Bynum requested that CLW reserve her hotel room at a 1997 conference, that CLW did so and paid $112.27 for the room, and that Bynum submitted a reimbursement request to MDE for more than the single room rate to cover the cost of two extra guests who stayed with her in the room. The termination letter also stated that Bynum prepared documents on her MDE computer for Dr. Haynes' personal business, that she and Dr. Haynes removed boxes of material from MDE, and that she sent communications to local coordinators criticizing the Associate Superintendent for Vocational Education.
¶ 11. The termination letter charged that Bynum's conduct constituted the following offenses:
Group One Offenses:
2. Abuse of state time such as unauthorized time away from work area or failure to notify supervisor promptly upon completion of assigned work;
Group Two Offenses:
1. Insubordination, including, but not limited to, resisting management directives through actions and/or verbal exchange, and/or failure or refusal to follow supervisor's instructions, perform assigned work, or otherwise comply with applicable establish [sic] written policy;
6. Unauthorized use or misuse of state property or records.
Group Three Offenses:
4. Falsification of records, such as, but not limited to, vouchers, reports, time records, leave records, employment applications, or other official state documents;
5. Willful or negligent defacement of or damage to the records or property of the State, another employee or business invitee or a state agency or office;
11. Acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to the public or to other state employees;
16. Willful violations of State Personnel Board policies, rules, and regulations.
¶ 12. Bynum appealed the termination to the EAB. After a full hearing, a hearing officer found that Bynum had sustained the burden of proof that MDE's reasons for firing her were not true. The hearing officer found, inter alia, that MDE had terminated Bynum in order to shift the blame onto Bynum for MDE's approval of the $900,000 software purchase when, in fact, others at MDE were responsible for the purchase approval. The EAB affirmed the hearing officer's decision. The circuit court reversed on certiorari review, and Bynum appeals, arguing that she presented substantial evidence that she was terminated without good cause.

STANDARD OF REVIEW
¶ 13. The State Personnel Board administers the state personnel system. Miss.Code Ann. § 25-9-103 (Rev.2003). A state agency may not dismiss an employee *90 governed by the state personnel system except for inefficiency or other good cause and after written notice and a hearing within the department. Miss.Code Ann. § 25-9-127(1) (Rev.2003). An employee may appeal a dismissal to the EAB. Miss. Code Ann. § 25-9-131(1) (Rev.2003).
¶ 14. While § 25-9-131(1) provides that proceedings before the EAB are de novo, the EAB must affirm a termination "if the agency has acted in accordance with the published rule and if the personnel action taken by the agency is allowed under the guidelines." Johnson v. Miss. Dep't of Corr., 682 So.2d 367, 370 (Miss.1996). The EAB is empowered to reinstate the employee if the employee meets the burden of proof to show that the reasons stated in the notice of dismissal are not true or are not sufficient grounds for the action taken. Miss.Code Ann. § 25-9-127(1) (Rev.2003). In rendering its decision, the EAB must determine whether the employee has shown that the agency's action was "arbitrary, capricious, against the overwhelming weight of the evidence and merits the relief requested." S.P.B. Rule 10.40.19(B) (Rev.1999). "[U]nless the employee carries the burden of persuasion that the alleged conduct did not occur, the employee has no right to have the employment decision overturned." Richmond v. Miss. Dep't of Human Servs., 745 So.2d 254, 258(¶ 14) (Miss. 1999). The EAB "is the trier of fact as well as the judge of the witnesses' credibility." Miss. Bureau of Narcotics v. Stacy, 817 So.2d 523, 526(¶ 9) (Miss.2002).
¶ 15. An agency aggrieved by a decision of the EAB may petition for a writ of certiorari to remove the case to the circuit court. Miss.Code Ann. § 11-51-95 (Rev.2002); Gill v. Miss. Dep't of Wildlife Conservation, 574 So.2d 586, 590 (Miss. 1990). On certiorari review, the circuit court limits its inquiry to "questions of law arising or appearing on the face of the record and proceedings." Miss.Code Ann. § 11-51-93 (Rev.2002). This places the circuit court in the "familiar posture" of judicial review of an administrative agency decision to determine whether that decision was supported by substantial evidence or was arbitrary and capricious. Gill, 574 So.2d at 591.
¶ 16. The standard of review of this Court is identical to that of the circuit court. Wilkinson County Bd. of Supervisors v. Quality Farms, Inc., 767 So.2d 1007, 1010(¶ 9) (Miss.2000). We must affirm the agency decision if that decision was (1) supported by substantial evidence; (2) not arbitrary or capricious; (3) within the scope or power of the agency; and (4) not in violation of a party's constitutional or statutory rights. Bd. of Law Enforcement Officers Standards and Training v. Butler, 672 So.2d 1196, 1199 (Miss.1996). "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone. An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." Mississippi State Dep't of Health v. Natchez, 743 So.2d 973, 977(¶ 13) (Miss. 1999) (citations omitted). "Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." Delta CMI v. Speck, 586 So.2d 768, 773 (Miss.1991) (quoting State Oil & Gas Bd. v. Mississippi Min. & Roy. Own. Ass'n, 258 So.2d 767, 779 (Miss. 1971)). Substantial evidence is a quantum of evidence "reasonable minds might accept as adequate to support a conclusion," and can be less than a preponderance of the evidence, but must be more than a scintilla. Id.
¶ 17. In appeals from the EAB, our review is complicated by the involvement *91 of two administrative agencies, the employing agency and the EAB. See Miss. Dep't of Corr. v. Harris, 831 So.2d 1190, 1192(¶ 8) (Miss.Ct.App.2002). Because substantial evidence may be less than a preponderance, it is possible for the same evidentiary record to provide substantial support for both the decision of the EAB and a contrary decision of the employing agency. Our precedent establishes that the decision which we are examining for support of substantial evidence is that of the EAB. Miss. Transp. Comm'n v. Anson, 879 So.2d 958, 964 (¶¶ 18-19) (Miss. 2004). Because it is the decision of the EAB that is under appellate review, if that decision is supported by substantial evidence, we may not interfere even if, viewed another way, the evidence would have provided substantial support for the opposite outcome. In this case, we must determine whether there was substantial evidence supporting the hearing officer's determination, as affirmed by the EAB, that Bynum met the burden of proof that MDE's reasons for dismissing her were not true or insufficient to support the dismissal. We find that, while substantial evidence supported most of the hearing officer's findings, evidence supporting other findings was lacking such that we must affirm the decision of the circuit court.

LAW AND ANALYSIS

I. WHETHER THE CIRCUIT COURT GAVE DEFERENCE TO THE UNANIMOUS DECISION OF THE EAB AND ITS HEARING OFFICER; WHETHER IT ADDRESSED THE CENTRAL FINDING OF EAB THAT MDE LEADERSHIP WAS RESPONSIBLE FOR THE SOFTWARE SELECTION WHICH WAS ITS PRINCIPAL ALLEGATION AGAINST THE APPELLANT.
¶ 18. Bynum's first appellate issue attacks the opinion of the circuit court reinstating her termination. Bynum complains that the circuit court only addressed three issues and found that those issues warranted reinstatement of the termination. She contends that the circuit court failed to afford proper deference to the EAB because it did not address the EAB's finding that others at MDE were responsible for the CLW software selection.
¶ 19. We have already discussed our standard of review of administrative agency decisions. This Court and the circuit court employ the same standard of review of agency decisions, wherein we review the record evidence to discern whether the agency decision was not supported by substantial evidence, was arbitrary and capricious, was beyond the agency's power, or violated a party's statutory or constitutional right. Wilkinson County Bd. of Supervisors, 767 So.2d at 1010(¶ 9). Regardless of the conclusion of the circuit court, our review focuses on the agency decision. Harris, 831 So.2d at 1192(¶ 5). Thus, when this Court reviews a judgment of the circuit court reversing an administrative agency, our finding that the decision of the agency was a proper exercise of the agency's statutory function will always necessitate reversal of the judgment of the circuit court. We proceed to our review of the EAB's decision to reinstate Bynum. We note that we must affirm the circuit court upon a conclusion that one of the EAB's findings that Bynum did not commit a terminable offense was unsupported by substantial evidence or was arbitrary and capricious. We find there was not substantial evidence of Bynum's innocence of two terminable offenses and, therefore, we affirm the circuit court's reinstatement of Bynum's termination.

II. WHETHER THE HEARING OFFICER CORRECTLY FOUND THAT BYNUM NEVER PUSHED OR ENDORSED COMPUTER LEARNING WORKS SOFTWARE.
¶ 20. MDE alleged that Bynum violated an oral MDE policy against endorsing a *92 particular software brand for WBL and CIP. Dr. Therrell Myers, a former associate superintendent for vocational education, testified that numerous management team meetings about the WBL pilot occurred in the fall of 1994. Though Bynum was not a manager, she attended many of the meetings. The management team identified a need for employability skills software for WBL.
¶ 21. At the meetings, with Bynum present, Dr. Myers gave specific instructions about purchasing protocol for the WBL sites. MDE employees were to promulgate generic specifications for the necessary WBL components, and each local coordinator was to evaluate and buy components for the site, including software. Dr. Myers frequently stated that MDE was not to place itself in the position of endorsing any one product to the local coordinators. He never instructed MDE employees to evaluate products for the local coordinators to buy.
¶ 22. Rhodes testified that, at MDE, a product purchase at the local or state level could be made as a "sole source" purchase. For sole source purchasing, the purchasing entity had to determine that the vendor was the only one that sold a product meeting the particular requirements. The entity had to document that no other vendors could meet the specifications. MDE's investigation revealed that WBL sites had documentation showing that CLW software was procured as a sole source purchase, but neither MDE nor the sites had ever determined that CLW sold the only software that could be used for WBL. The MDE never directed that WBL sites purchase software from CLW as a sole source.
¶ 23. In the termination letter, MDE charged that Bynum committed the following acts constituting endorsement of CLW software to the local coordinators of WBL and CIP in violation of the oral policy. Bynum conducted a WBL workshop for the local coordinators on January 9, 1995 at which CLW software was demonstrated and evaluated. DeWayne Magee of Magee Enterprises, a CLW distributor, was at the workshop, and CLW was the only brand of software presented. Individuals present maintained that Bynum endorsed CLW software as the only software package meeting the needs of WBL. After the workshop, Bynum sent or gave the local coordinators a list of three CLW vendors. There was a document on Bynum's computer that was sent or given to the WBL sites stating that the local coordinators evaluated and recommended CLW software for WBL, and including the purchase price for CLW software that was the same amount that MDE had allocated for software expenditure for WBL. Further, several agendas for WBL and CIP meetings listed CLW vendors as presenters for computer software training.
¶ 24. MDE charged that Bynum's office was responsible for setting the annual dollar allocations for software for WBL. Because CLW vendors submitted quotes at or below the allocated amount each year, it was apparent to MDE that CLW vendors knew of the amount allocated prior to submitting the quotes. A WBL site, East Mississippi Community College, prepared a requisition for the purchase of CLW software from Magee Enterprises. The requisition stated the CLW software was to be purchased pursuant to Bynum's instructions and that EMCC would be reimbursed through WBL funding. A sole source letter was attached.
¶ 25. MDE also alleged that Bynum effectively created a sole source vendor for the software for CIP. Bynum authored specifications for software, which were sent to CIP pilot sites, that described CLW software and tracked CLW's own promotional description. Because only *93 CLW software could meet the specifications, Bynum effectively created a sole source vendor for CIP software.
¶ 26. MDE cited other evidence supporting the conclusion that Bynum endorsed CLW software. Bynum helped Dr. Haynes collect documents in response to the Ethics Commission subpoena. One such document was the agenda for the January 1995 WBL workshop at which Magee presented CLW software. On November 10, 1999, the agenda was altered on Bynum's computer. MDE alleged the alteration consisted of the removal of Bynum's and Magee's names from the agenda. The alteration occurred the day after Dr. Haynes represented to auditors that no vendors had been present at the January 1995 workshop. For the subpoena response, Bynum also provided a letter from Aspen Technologies; Aspen Technologies denied the authenticity of the letter. Also, Bynum wore a preprinted CLW name tag at a 1995 AVA convention and was seen in CLW's booth, where she told a vocational staff person that she worked for CLW. Finally, CLW paid for Bynum's hotel reservation at a 1997 AVA convention.
¶ 27. Rhodes testified that Bynum's CLW software endorsement constituted the Group Two offense of insubordination and the Group Three offense of acts of conduct occurring on or off the job and plainly related to job performance such that MDE's continuation of Bynum in the job could constitute negligence. Dr. Thompson testified that Bynum's software endorsement also violated the Group Three offense of willful violation of SBP policies, and was a conflict of interest. MDE submitted a copy of its written ethical policies stating that employees must not participate in trips sponsored or paid for by vendors and to avoid any activity that might have the potential of undermining the credibility of the agency.
¶ 28. The hearing officer found that Bynum met the burden of proof of showing that MDE's reasons for firing her were not true. He found that Bynum never willfully violated any SPB policy or committed any "act of conduct." The hearing officer stated that "the facts and documents seem to reflect that others, not [Bynum], were responsible for endorsing or pushing the software, or displaying a total lack of knowledge or appreciation for the state purchasing procedure" and that it was apparent that MDE sought to blame Bynum for the actions of her superiors that resulted in the approval of the $900,000 CLW software purchase for CIP.

A. Bynum's activities concerning the Work Based Learning program.
¶ 29. Bynum's first argument regarding software endorsement concerns the WBL program. Bynum argues that substantial evidence supported the hearing officer's finding that her activities regarding WBL did not violate the oral policy against endorsing a particular product. Bynum testified that she did not receive any formal job training when she began working at MDE. In the beginning, she attempted to emulate what MDE had done in the past and used materials from another vocational program, Tech Prep, as templates from which to draft documents for WBL. Bynum said that part of her job was helping the local coordinators to find materials to meet the program requirements.
¶ 30. Bynum conducted the January 1995 workshop attended by WBL local coordinators. Magee testified that he gave a fifty to fifty-five minute presentation of the software at the behest of Dr. John Harper, an owner of CLW. Dr. Harper stated that the CLW presentation had not been requested by Bynum. After the presentation, Bynum handed out evaluation forms for the software so the coordinators *94 could rate the software. The software received favorable ratings for application to WBL. Roger Whitlock, a local coordinator, testified that he bought CLW software after the workshop.
¶ 31. Bynum testified that Dr. Haynes had set the agenda for the 1995 workshop and that she had nothing to do with the decision that a CLW representative would attend. Bynum had never seen CLW software before the workshop. She said that she drafted the evaluation forms for the 1995 workshop by copying Tech Prep forms. After the workshop, she sent the local coordinators information about CLW software stating that the local coordinators had evaluated and recommended it. She drafted the CLW information from material that had been used in Tech Prep. The CLW information included the language, "this company is a source for this software but there is no State Contract. Districts are to purchase materials and software in compliance with State Purchasing Laws." No sole source letter was attached to the information. She never told any local coordinator to buy CLW software or that CLW software was the only software to be used for WBL.
¶ 32. As recognized by the hearing officer, the January 1995 workshop was not the first presentation of CLW software to the local WBL coordinators. In July 1994, before Bynum came to work at MDE, MDE conducted a five day WBL workshop at which Dr. Harper, an owner of CLW, presented a segment entitled "Software/Courseware Resources." Dr. Harper's presentation was the only software presentation on the workshop's agenda and witnesses testified that CLW software was the only software presented at the entire week-long workshop. In addition to the local coordinators, the workshop was attended by Dr. Myers, Dr. Haynes, Dr. Rebecca Love-Wilkes, and persons at the management level of MDE.
¶ 33. Dr. Love-Wilkes, who worked for the Research and Curriculum Unit at Mississippi State University, testified that she attended the 1995 workshop and had asked Bynum whether any other software was available for WBL. Bynum responded, "there may be, but we don't know what they are." After the workshop, Dr. Love-Wilkes communicated her concern to Dr. Myers that the local coordinators were being told to buy one brand of software. Dr. Myers responded that there was no cause to worry because the coordinators would not buy software without going through the process that had been set up for software purchasing. Dr. Myers did not speak to Bynum about the 1995 workshop; indeed, none of Bynum's superiors ever confronted Bynum with criticism about her work at MDE until Dr. Thompson filed the ethics complaint in September 1999.
¶ 34. The question before the hearing officer was whether Bynum's role in the presentation of the CLW software at the 1995 workshop and her transmittal of information on CLW software to the local coordinators violated MDE policy. There was substantial evidence supporting the hearing officer's conclusion that Bynum's conduct surrounding the 1995 workshop did not contravene MDE policy. As the fact-finder, it was within the discretion of the hearing officer to weigh the witnesses' testimony. The hearing officer found it likely that any action taken by Bynum during or for the workshop would have been based upon information on prior workshops and upon advice from others. The hearing officer found it improbable that Bynum set the agenda for the January 1995 conference because, at that time, Bynum had been employed by MDE for only three months and had not received *95 any training. Those findings were supported by Bynum's testimony that she conducted the CLW presentation at the request of her superior, Dr. Haynes, and that she based her conduct of the workshop upon prior MDE workshops.
¶ 35. It was undisputed that Bynum instructed the local coordinators that all software was to be procured according to state purchasing procedures. Her testimony supports the conclusion that she never told the coordinators to deviate from the state purchasing procedures. After the 1995 workshop, Dr. Myers received notice from Dr. Love-Wilkes that Bynum had presented CLW software to the local coordinators. Before Bynum's employment, MDE had already presented CLW software to the local coordinators. These facts support the hearing officer's finding that Bynum's conduct of the 1995 workshop did not violate MDE policy.
¶ 36. MDE argues that Bynum never disproved that she engaged in conduct endorsing CLW software for WBL or disproved her ability to influence the local coordinators to purchase the software. MDE contends that evidence that others at MDE endorsed CLW software does not prove that MDE's reasons for firing Bynum were not true. Certainly, Bynum did not disprove that she made the local coordinators aware of the availability of CLW software for WBL. However, Bynum did show that, despite Dr. Myers' oral directive not to endorse a certain product, Bynum's superiors at MDE were on notice that Bynum conducted the workshop on CLW software, and MDE held its own workshop presenting CLW software. A reasonable person could conclude from the evidence that, on or before January 9, 1995, MDE's oral policy against endorsing a particular product did not include activities such as those engaged in by Bynum, and that any inducement to purchase CLW software felt by the local coordinators in 1995 had been sanctioned by MDE.
¶ 37. Another charge against Bynum was that she set the annual spending allocation for WBL software, presumably adjusting it to accommodate the cost of CLW software. The hearing officer found that Bynum did not set the annual WBL software allocation based upon a July 26, 1994 letter from Donna Richardson of the Bureau of Vocational Compliance and Reporting to the superintendent of Hancock County schools providing a $4,000 allocation for WBL software. The hearing officer's conclusion that Bynum did not set the allocation was supported by substantial evidence. In addition to the July 1994 letter, a document entitled "Work-Based Learning Project Reimbursement for FY 95," dated June 15, 1994, showed the $4,000 software allocation. Other documents signed by Donna Richardson set out WBL funding for later fiscal years, including software allocations. Bynum testified that she did not set the allocation or communicate the allocation amount to CLW vendors. The documents showing the allocation was set prior to Bynum's employment at MDE, the documents showing that the Office of Compliance and Reporting set the allocations, and Bynum's testimony were substantial evidence that Bynum did not set the annual software allocation or communicate the allocation amount to CLW vendors.
¶ 38. In the termination letter, MDE cited a CLW software requisition prepared by East Mississippi Community College in 1996 as evidence that Bynum pushed EMCC to buy CLW software. The requisition contained the statement, "[s]oftware is to be purchased per instructions from Brenda Bynum. EMCC to be reimbursed through state WBL funding." The hearing officer found it unbelievable that Bynum *96 caused EMCC's CLW software purchase.
¶ 39. There was substantial evidence in the record supporting the hearing officer's conclusion. Bynum testified that, when a local WBL coordinator requested reimbursement for a software purchase, the coordinator sent the request to the Office of Compliance and Reporting. That office sent the request to Bynum. Bynum approved the purchase if it fit within the WBL program requirements.[1] Bynum sent approved requests back to the Office of Compliance and Reporting, which reimbursed the schools for the purchase. Documents from the Office of Compliance and Reporting complemented Bynum's description of the purchase approval process.
¶ 40. Linda Gates, the WBL coordinator at EMCC, testified that the statement that the software was to be purchased per Bynum's instructions was not meant to communicate that Bynum had ordered EMCC to make the particular software purchase. Rather, the statement was meant to communicate that CLW software had been approved by Bynum as compatible with the WBL program and, therefore, EMCC could expect reimbursement from MDE for the software purchase up to the allocated amount. She chose CLW software for EMCC because she thought the other local coordinators used it and liked it, not because she felt pressure from Bynum to purchase it.
¶ 41. Though MDE charged that a "one source" letter was attached to the EMCC requisition, the letter attached to the requisition actually was a communication from CLW to EMCC stating that Magee Enterprises was the only distributor in Mississippi authorized to sell CLW software. The letter in no way communicated that CLW software was the sole source of software for WBL. The hearing officer's finding that Bynum did not cause EMCC to purchase CLW software was not arbitrary and capricious.
¶ 42. Finally, the termination letter alleged that agendas showed CLW software was presented at training sessions for the local WBL coordinators. Bynum testified that she organized four training sessions per year for the local coordinators. At a 1996 training session, several coordinators presented products they found useful for WBL. CLW software was one of the products presented by a local coordinator. Bynum testified that many products were presented by coordinators at the session. On a 1997 WBL training session agenda, CLW software was listed under the heading "Computer Training" along with other types of software used by the local coordinators. Bynum testified that many products were presented at this session also. No CLW vendor was present. Bynum described the sessions as gatherings for the local coordinators to discuss WBL and to share resources. No evaluations of CLW software for its applicability to WBL were conducted at either session.
¶ 43. The hearing officer found that Bynum did not endorse CLW software contrary to any MDE policy. The hearing officer made no specific findings regarding the 1996 and 1997 WBL sessions. The evidence showed that local WBL coordinators had purchased CLW software. At the 1996 session organized by Bynum, CLW was merely one product *97 of many presented by a local coordinator for the benefit of the other coordinators. Bynum's allowing a local coordinator to make a presentation to other coordinators did not contravene the oral policy against an MDE employee endorsing a product to the WBL coordinators. Regarding the 1997 session, it appears that Bynum determined that CLW would be part of the computer training. By 1997, most if not all of the local coordinators had already bought CLW software. Bynum stated that she never endorsed CLW software to the coordinators as a product they were supposed to purchase, and the coordinators were free to investigate other brands. One could reasonably conclude from this evidence that Bynum's placing CLW software on the 1997 agenda was not an attempt to endorse CLW, but rather to help the local coordinators receive training on one of the products which most or all of them had already decided to purchase.
¶ 44. Regarding WBL, we find that the hearing officer's conclusion that Bynum did not violate MDE policy was supported by substantial evidence.

B. Bynum's activities concerning the Construction Initiative Program.
¶ 45. Bynum testified that she assisted Dr. Haynes in his implementation of CIP at several pilot sites, beginning in 1996. Bynum testified that she did not initiate any action regarding CIP, but carried out the instructions of Dr. Haynes. Her duties for CIP included working with industries and businesses, setting up meetings, conducting training, and typing information and budgets.
¶ 46. In contrast to the WBL program, there was no evidence that MDE had a policy, whether oral or written, specifically barring an MDE employee from selecting a specific product for use at the CIP pilot sites. On September 12, 1996, Dr. Haynes sent a memorandum to local CIP coordinators. The memorandum was typed by Bynum and copied to Dr. Myers, Donna Richardson, Bennie Byrd, a vocational technical director, and Bill Blasingame. Rhodes testified that Blasingame was a vocational bureau director who, though technically at the same level as Dr. Haynes, functioned as Dr. Myers's second in command in the vocational department. The memorandum identified two software programs approved for use in CIP. Both software programs were manufactured by CLW and were the same software programs that had been used in WBL. The memorandum contained a statement signed by Donna Richardson that the allocation for the two CLW software programs was $9,600 per pilot site. Bynum testified that she had nothing to do with the selection of CLW software for CIP.
¶ 47. Bynum put together another memorandum for Dr. Haynes, dated September 12, 1996, that was sent to Reuben Myers, the superintendent of Canton Public School District, and copied to Dr. Myers, Richardson, and Blasingame. The memorandum contained specifications for CIP hardware and software. The software specifications described CLW software. The memorandum contained a comparison of CLW software to the SCANS competencies, a component of the WBL curriculum. Bynum testified that Dr. Haynes had determined the content of the memorandum.
¶ 48. The termination letter stated that agendas for CIP training detailed the presentation of CLW software for computer software training. Bynum admitted that she had created agendas in 1996 and 1998 for training sessions for the CIP pilot coordinators that included presentations of CLW software. Bynum said that she did not decide that CLW software would be presented at the sessions, but that the *98 decision was made by Dr. Haynes. Dr. Harper recalled that the CLW presentations were requested by Dr. Haynes, though he was not positive. Bynum testified that she organized the sessions by selecting the sites, calling the attendees, and constructing the agendas.
¶ 49. The letter also stated that Bynum effectively created a sole source for CIP software by drafting CIP software specifications that closely tracked CLW's own promotional description of its software. The hearing officer did not specifically address the agendas or software specification issues. However, the hearing officer did make general findings encompassing these issues. The hearing officer found that Bynum had not willfully violated SPB policy and had not engaged in any "act of conduct" that would cause MDE's retention of Bynum to constitute negligence. The hearing officer found that MDE's termination of Bynum was an attempt to shift responsibility to Bynum for the acts of Bynum's superiors at MDE that resulted in the erroneous approval of the $900,000 CLW software purchase for the CIP statewide expansion.
¶ 50. We find that there was substantial record evidence from which a reasonable person could conclude that Bynum's activities surrounding the agendas was not an endorsement of CLW software contrary to any MDE policies. Bynum testified that she did not make the decision that CLW would be present at the training sessions but that the decision was made by Dr. Haynes. Her testimony was substantial evidence that she did not make the determination that CLW software would be presented and thus endorsed.
¶ 51. Further, the MDE policy applicable to Bynum was unclear. While state purchasing procedures presumably were to be followed by state entities, MDE had no specific policy against software selection for CIP as it did for WBL. The memorandums from Dr. Haynes and copied to Dr. Myers and Blasingame were substantial evidence that Dr. Haynes was responsible for recommending CLW software to the CIP pilot sites and that Dr. Haynes acted with the implicit approval of Dr. Myers and Blasingame. We recognize the evidence that MDE later concluded, in 1999, that Dr. Haynes had not followed the proper investigative procedures in his selection of CLW software for CIP. However, Bynum's testimony and the memorandums were substantial evidence that Bynum was following the instructions of Dr. Haynes when she drafted the agendas in 1996 and 1998 and that her acts did not contravene any MDE policy then in place. The evidence supported the conclusion that, as far as Bynum was concerned, her drafting of the agendas was in fact within a policy set by her superiors at MDE of recommending CLW software for CIP. The hearing officer's finding that MDE sought to blame Bynum for the acts of her superiors was a reasonable one based upon the substantial evidence that Bynum's superiors determined that CLW software would be used at the CIP pilot sites.
¶ 52. We proceed to MDE's allegation that Bynum effectively created a sole source for software for CIP by drafting specifications that described CLW software. In 1998, Blasingame had instructed Bynum's bureau to draft software specifications to allow the CIP sites to search for software instead of having the CIP sites purchase CLW software from the ITS Express Products List. Bynum admitted that, in 1998, she drafted software specifications to be sent to the CIP pilot sites at the request of Dr. Haynes. She stated that she had never been trained on drafting software specifications and had never before drafted software specifications.
*99 ¶ 53. Bynum sent the specifications to Jimmy McCully at the Research and Curriculum Unit at Mississippi State University. McCully reformatted the specifications and returned them to Bynum, who then sent them to the CIP pilot sites. McCully testified that the specifications closely resembled CLW product literature. In fall 1999, McCully revised Bynum's specifications and MDE used them to obtain bids for software for the CIP statewide expansion. Plato, another software company, was found to offer the cheapest software that fulfilled the specifications.
¶ 54. Bynum testified that she drafted the specifications at the request of Dr. Haynes. Apparently Bynum herself determined the content of the specifications. There was overwhelming evidence that Bynum decided to copy CLW promotional materials to craft what were supposed to be generic software specifications. That decision greatly increased the likelihood that CLW software would be selected. Bynum offered no explanation for her decision.
¶ 55. The hearing officer found that Bynum never violated SPB policy willfully. Regarding this offense, we defer to the hearing officer's assessment of Bynum's state of mind. MDE also terminated Bynum for committing acts of conduct such that retaining Bynum in her position would constitute negligence on the part of MDE. That ground does not require a heightened state of mind accompanying the employee's acts. We have recited the relevant evidence, and we find substantial evidence did not support the conclusion that Bynum proved she did not contravene MDE policy by drafting specifications tracking the promotional description of CLW software. The hearing officer's decision to reinstate Bynum was arbitrary and capricious because Bynum failed to prove that she did not commit one of the terminable offenses listed in the termination letter.

III. WHETHER THE HEARING OFFICER CORRECTLY FOUND THAT BYNUM DID NOT VIOLATE OTHER STATE PERSONNEL BOARD POLICIES, RULES AND REGULATIONS.
¶ 56. We turn to the array of other offenses listed in the letter terminating Bynum. We find that substantial evidence supported the hearing officer's findings on all but one of these offenses.

A. The 1995 WBL workshop agenda.
¶ 57. This allegation concerns the agenda Bynum drafted for the January 1995 WBL workshop discussed in Issue II. Bynum admitted that she assisted Dr. Haynes in compiling documents required by the Ethics Commission subpoena due November 12, 1999. One of the documents submitted by Dr. Haynes was the agenda for the 1995 workshop. During its investigation of Bynum, MDE retrieved documents from Bynum's computer and discovered that the 1995 agenda submitted by Dr. Haynes had been altered on November 10, 1999 at 7:04 p.m. On November 10, 1999, a MDE employee saw Bynum and Dr. Haynes leaving the department at approximately 7:30 p.m.
¶ 58. MDE generated a report showing the date and time the agenda had been altered. MDE alleged that the alteration consisted of the deletion of the names of Bynum and Magee from the agenda and the replacement of those names with the words "Hinds Community College Hands-on Demonstration." MDE alleged that the deletion occurred the day after Dr. Haynes had represented to Internal Accountability auditors that no vendors had been present at the 1995 workshop. MDE argued that Bynum deleted the names in *100 order to conceal from the Ethics Commission the fact that she and Magee had presented CLW software to the local WBL coordinators at the workshop.
¶ 59. The hearing officer did not directly address the proof of Bynum's alteration of the agenda. Instead, the hearing officer opined that MDE's allegation that a CLW software presentation by Bynum and Magee violated MDE policy was erroneous because MDE also conducted a CLW software presentation in 1994. The hearing officer generally found that Bynum did not willfully violate MDE policy or commit any act of conduct that would render MDE's retention of Bynum negligence, and that MDE fired Bynum in order to blame her for the acts of others at MDE.
¶ 60. There was substantial record evidence that Bynum did not alter the agenda, willfully or otherwise, by removing the names of herself and Magee. Bynum testified that, before November 10, 1999, she had already informed the Ethics Commission that Magee had been present at the 1995 workshop. Bynum admitted gathering documents for Dr. Haynes on November 10, 1999 to submit in response to the subpoena. It was undisputed that the agenda was in fact altered on November 10, 1999 at 7:04 p.m. by someone using Bynum's computer. But, Bynum showed that the alteration did not necessarily consist of the removal of the names of herself and Magee from the agenda.
¶ 61. MDE proved that the agenda was altered, but did not show how it was altered. Laurie Pierce, who worked for MDE's office of Management Information Systems, testified on cross-examination that the alteration could have consisted of someone pressing the space bar or running a spell check on the document. MDE's proof that Bynum removed the names was the presence of other agendas on Bynum's computer with the names of herself and Magee, and the fact that the agenda listing herself and Magee was the one Bynum actually sent out to the local WBL coordinators. From that evidence, MDE concluded that Bynum replaced the names with the words "Hinds Community College Hands-on Demonstration" that were on the agenda submitted to the Ethics Commission.
¶ 62. Bynum denied that she altered the agenda in the way alleged by MDE. Several copies of the 1995 workshop agenda existed on Bynum's computer that were admitted into evidence. There were two copies with the names of Bynum and Magee. There was the copy submitted to the Ethics Commission with "Hinds Community College Hands-on Demonstration." There was also another copy, last modified in 1996, with "Hinds Community College Hands-on Demonstration" in place of the names of Magee and Bynum. The existence of that document showed that an agenda with "Hinds Community College Hands-on Demonstration" existed long before MDE began investigating Bynum. There was substantial evidence that, on November 10, 1999, Bynum simply printed an old copy of the 1995 workshop agenda that already contained the words "Hinds Community College Hand-on Demonstration" and ran a spell check or touched the space bar before printing the document.

B. The Aspen Technologies letter.
¶ 63. Bynum addressed a letter to Susan Tierson at Aspen Technologies on November 21, 1994. The letter requested that Tierson help select a software meeting the WBL curriculum requirements. On December 15, 1994, Tierson sent a letter stating that, after a search, no software sufficiently matching the WBL curriculum was found. Tierson's letter featured an Aspen Technologies logo, address and phone number. Tierson's letter was *101 included in the documents which Dr. Haynes submitted in response to the Ethics Commission subpoena.
¶ 64. The termination letter alleged that Bynum presented a letter in response to the subpoena purporting to be from Aspen, but that Aspen denied the authenticity of the letter. At the EAB hearing, MDE submitted a letter from John Magats, a sales operations director at Aspen, dated January 31, 2000. Magats stated that, to the best of his recollection, Tierson's letter was never sent by Aspen and the logo and phone number on the letter were not those used by Aspen. Sonya Amis, who investigated Bynum, testified that the phone number was incorrect. She testified that the logo on the letter did not match the logo on some Aspen invoices from 1994 and 1995. MDE never contacted Tierson about the letter.
¶ 65. A computer generated report showed that Bynum's letter to Aspen had been created on November 21, 1994. Bynum submitted a Dun & Bradstreet Regional Business Directory listing showing an address for Aspen matching the one on the letter from Tierson. Bynum denied that she wrote the Tierson letter herself. The hearing officer found that Bynum had shown that Aspen had more than one address and that MDE could not charge Bynum with falsely responding to a subpoena because she never was issued a subpoena and did not know at the time that the documents which she compiled for Dr. Haynes were in response to a subpoena.
¶ 66. The findings of the hearing officer were substantially supported by the evidence. MDE's main proof that the letter from Tierson had been created by Bynum was Magat's letter opining that the letter had not been sent by Aspen and stating that the letter bore an incorrect logo, address, and phone number. This evidence was partially contradicted by the Dun & Bradstreet listing showing Aspen's address as the one on Tierson's letter. Bynum testified that she did not fabricate Tierson's letter. MDE never interviewed Tierson, but relied upon the letter from Magat which was sent six years after the Tierson letter. It was the role of the hearing officer to select between conflicting evidence and to make credibility determinations, and the hearing officer was entitled to credit the evidence submitted by Bynum that she did not falsify the letter.

C. Removal of material from MDE.
¶ 67. In the termination letter, MDE charged that Bynum helped Dr. Haynes remove boxes of material from MDE and place them into Dr. Haynes's truck. MDE insinuated that Bynum helped Dr. Haynes remove incriminating material by stating that Bynum and Dr. Haynes had repeatedly said during the investigation that WBL and CIP documents were missing, lost or purged. Rhodes testified that this constituted the Group Three offense of willful or negligent defacement of or damage to state property.
¶ 68. Bynum testified that she did help Dr. Haynes remove material from MDE, but that the material in question consisted of Dr. Haynes's personal items that he was removing in anticipation of being terminated or asked to resign due to a change in gubernatorial administrations. She denied purging, deleting, or destroying MDE documents. The hearing officer credited Bynum's testimony that the material she helped remove from MDE consisted of personal items. There was no other evidence beyond mere speculation of what the boxes might have contained. Bynum's testimony was substantial evidence that Bynum did not remove MDE records or property from the department.

*102 D. Bynum's conduct at a 1995 American Vocational Association convention.

¶ 69. The termination letter stated that, after twice being denied permission to attend, Bynum took personal leave to attend a 1995 American Vocational Association conference. At the conference, a vocational staff person witnessed Bynum in a CLW booth wearing a CLW name tag. The staff person reported that Bynum said she worked for CLW.
¶ 70. Rhodes testified that this conduct was a willful violation of SPB policy, a conflict of interest, and constituted acts of conduct such that retaining Bynum would be negligence on the part of MDE. Rhodes testified that Bynum's activities during personal leave time would not violate SPB policy unless her activities affected MDE. We proceed to the allegations of a conflict of interest created by Bynum's activities.
¶ 71. Bynum testified that she had attended annual AVA conferences regularly for many years before the 1995 conference. In 1995, she planned to attend the AVA conference in Denver, Colorado and to give a presentation with Dr. Haynes, but Dr. Myers denied permission for her to attend. She took personal leave time and attended at her own expense. Bynum admitted that she used a preprinted CLW name tag in order to be admitted to a trade show at the conference. She admitted visiting the CLW booth, but denied that she worked for CLW or telling anyone that she worked for CLW. Bynum stated that she had saved the $185 or $200 trade show registration fee by using the CLW name tag. She testified that she decided to use the CLW tag instead of paying the fee because she did not think her attending the trade show was worth paying the price of admission. On direct examination, Bynum could not recall how she obtained the CLW name tag. On cross-examination, Bynum stated that she did not ask anyone at CLW to register her for the trade show. Dr. Harper, an owner of CLW, testified that someone on his staff had asked him to approve issuing a name tag to Bynum. Dr. Harper said that Bynum never worked for CLW.
¶ 72. David McCullough was employed by a community college when he saw Bynum at the 1995 AVA conference. He testified that he saw Bynum in the CLW booth wearing a CLW name tag, and that Bynum told him that she worked for Dr. Harper of CLW. Some time later, McCullough reported the incident to MDE.
¶ 73. The hearing officer found that MDE discovered the name tag incident in 1996. The hearing officer stated:
The Responding Party having had knowledge [of] the alleged incident, since 1996, cannot in 2000, decide to punish the employee for that old infraction, whether such infraction is an abuse of state time, or the appearance of a conflict of interest. While an employee does not have the right to be charged at his or her convenience, the Responding Party has the responsibility to bring the violations to the attention of the employee within a reasonable time; a four year delay is not reasonable. It is an established rule that a written reprimand given to a state service employee, that is over one year old, is not considered in any disciplinary proceeding against that employee by the Employee Appeals Board, with certain exception, this incident not being one of the exceptions. Bringing or attempting to bring this old infraction reflects not on the Appealing Party's actions, but rather upon the integrity of the Responding Party.
It is clear from the hearing officer's resolution of this issue that the hearing officer considered Bynum's admitted conduct to be an infraction, but found MDE barred from terminating Bynum for the infraction *103 because MDE failed to take action against Bynum within a reasonable time of its notice of Bynum's misconduct.
¶ 74. The hearing officer's finding that MDE had notice of the name tag incident since 1996 was erroneous. Rhodes's testimony indicated that the date on which MDE received notice was unknown. Rhodes testified on direct examination that McCullough contacted MDE approximately one year prior to the commencement of the spring 1999 investigation. On cross-examination, Rhodes stated that it could have been more than two years prior to spring 1999. McCullough could not recall when he informed MDE. The testimony establishes that, while MDE certainly knew of the incident at least one year prior to spring 1999, it is uncertain when MDE learned of the incident. Therefore, the hearing officer's finding that MDE waited four years to bring up the offense was not based upon substantial evidence.
¶ 75. Rhodes testified that MDE had good reason to delay action against Bynum for the name tag incident. Rhodes stated that, at the time she received notice of the incident, McCullough could not be located. Rhodes stated that she decided not to pursue the matter further at the time because the significance of Bynum's conduct as a conflict of interest did not become apparent until further evidence of her involvement with CLW came to light.
¶ 76. It is apparent from the hearing officer's opinion that the hearing officer considered Bynum's conduct to be a conflict of interest. That finding was supported by substantial evidence. Bynum admitted wearing a vendor's name tag at the AVA conference. MDE had written rules providing that employees "must avoid all actual or potential conflicts between their public responsibilities and duties and their private affairs" and that employees must not participate in trips sponsored or paid for by vendors. Rhodes testified that Bynum's conduct at the AVA conference violated the Group Three offense of acts of conduct plainly related to job performance such that MDE's retention of Bynum would constitute negligence toward the public or other state employees. Yet, the hearing officer found that MDE could not terminate Bynum for the offense because MDE failed to take action against Bynum within a reasonable time of its notice of her misbehavior.
¶ 77. We observe that MDE decided to terminate Bynum based upon her 1995 conduct only after new evidence regarding Bynum's involvement with CLW came to light. Therefore, this issue presents the question of whether SPB rules and regulations prohibit an employing agency from terminating an employee due to the passage of time between the agency's notice of the employee's misbehavior and the agency's decision to terminate the employee. We consider the policies cited by the hearing officer. The hearing officer stated that MDE must take action against an employee for a terminable offense within a reasonable amount of time, and that, barring exception, the EAB cannot consider a written reprimand to a state service employee that is over one year old.
¶ 78. Firstly, we consider the hearing officer's application of the one-year rule. There is no SPB rule stating that an agency cannot fire an employee for an offense that is over one year old. The SPB rules do provide that an employee may be terminated for committing two or more Group Two offenses within the span of one year, but that rule does not apply to Group Three offenses. S.P.B. Rule 9.10(B) and (C) (Rev.1999). An employee's commission of a single Group Three offense is grounds for termination, and that rule *104 does not provide a time limit. S.P.B. Rule 9.10(C) (Rev.1999).
¶ 79. Secondly, we consider the hearing officer's decision that MDE cannot terminate an employee after the passage of a certain amount of time from MDE's notice of the terminable offense. Bynum relies upon Hemba v. Miss. Dep't of Corr., 848 So.2d 909 (Miss.Ct.App.2003) in which this Court upheld the EAB's reinstatement of Hemba. In our statement of the facts, this Court recited the various findings of the hearing officer, including findings concerning MDOC's charge that Hemba brought a gun into the workplace. Id. at 912(¶ 8). MDOC had notice of this offense three years before disciplining Hemba. Id. The hearing officer found that Hemba committed the offense but refused to consider the charge as it was untimely brought. Id. at (¶ 9). We stated that the hearing officer, "exercising his discretion as the trier of fact, dismissed the gun charge as being too remote in time and because no disciplinary action had been brought within a reasonable time." Id. This Court went on to reinstate the EAB's decision without commenting on the hearing officer's resolution of the gun charge. Id. at 914-15 (¶¶ 17-20). Bynum argues that Hemba stands for the proposition that an EAB hearing officer possesses discretion not to consider offenses brought by the employing agency upon a determination that the offense was too remote in time.
¶ 80. We find that Hemba does not stand for such a broad proposition. The EAB possesses only limited authority and must act within its enumerated powers. Miss. Employment Sec. Comm'n v. Culbertson, 832 So.2d 519, 532(¶ 50) (Miss.2002). The EAB is bound to affirm a termination "if the agency has acted in accordance with the published rule and if the personnel action taken by the agency is allowed under the guidelines." Johnson v. Miss. Dep't of Corr., 682 So.2d 367, 370 (Miss.1996). Bynum fails to cite and this Court is unable to find any SPB rule or regulation specifically precluding an agency from terminating an employee due to the passage of time between the agency's notice of an offense and the termination. Rather, the statutes and rules provide that the EAB must affirm a termination unless the employee has shown that the reasons for the termination were not true or were insufficient to merit the termination. Miss.Code Ann. § 25-9-127; S.P.B. Rule 10.40.19(C) (Rev.1999). In this case, MDE determined in 2000 that, considering Bynum's other involvement with CLW, Bynum's conduct at the 1995 AVA conference evinced a conflict of interest. No statute or rule restricts MDE from reclassifying an employee's past conduct as terminable in light of new evidence and then terminating the employee. The hearing officer acted outside the power afforded to the EAB by finding MDE so restricted. We affirm the decision of the circuit court reversing the EAB's reinstatement of Bynum to state employment. To the extent that Hemba conflicts with this decision, it is hereby overruled.

E. Bynum's use of her state-issued credit card for personal expenses.
¶ 81. The termination letter stated that, in 1995, Bynum charged some of her travel and personal expenses to her state issued credit card in violation of MDE policies. MDE policy stated that credit cards issued to MDE employees were to be used while the employees were traveling on state business and were not for personal use. The employee was responsible for paying the credit account and applying for reimbursement from MDE.
¶ 82. Bynum admitted that, on the 1995 trip, she charged some expenses of a personal *105 nature to the MDE-issued credit card. She testified that she was unaware that using the card for personal expenses was against MDE policy, and that her husband had paid the monthly credit card bill. Rhodes testified that Bynum's use of the card for personal expenses violated the Group II offense of unauthorized use or misuse of state property. The hearing officer found that Bynum had used the MDE credit card for personal expenses but that she had been unaware her conduct was against state policy. The hearing officer questioned the motivation of MDE for bringing the charge in 2000 instead of in 1995.
¶ 83. An employee's commission of a Group Two offense, standing alone, is not grounds for termination. S.P.B. Rule 9.10(B). Bynum's commission of a single Group Two offense in 1995 does not impact upon MDE's termination decision. To the extent that this offense falls into the Group Three category of a willful violation of S.P.B. policy, the hearing officer found that Bynum never willfully violated S.P.B. policy. This finding was supported by substantial evidence in that Bynum, ignorant of the existence of MDE's credit card policy, could not have made a willful decision to act in violation of the policy.

F. Bynum's 1997 hotel room reservation.
¶ 84. The termination letter stated that Bynum requested that CLW reserve her room at a 1997 AVA conference and that CLW paid $112.27 for the room. During the 1999 investigation, Bynum recalled that she had requested that CLW reserve the room, that Gary Bunner of CLW had paid for the room, and that she had neglected to repay Bunner. In December 1999, Bynum's attorney sent Bunner a check from Bynum's husband in the amount of $112.27 as repayment for the room. Rhodes testified that Bynum's allowing Bunner, a CLW representative, to pay for her room constituted the Group Three offense of acts of conduct relating to job performance such that MDE's continuing Bynum in her position would constitute negligence.
¶ 85. The hearing officer correctly refused to consider this charge because MDE did not give Bynum proper notice of the charge. MDE first gave Bynum notice of this ground for termination in the termination letter. State Personnel Board Rule 9.20.6 (Rev.1999) requires an appointing agency to give an employee written notice listing all the reasons for the agency's consideration of the adverse action at least ten days before any adverse action. The rule states that the reasons listed in the pre-termination notice are the only reasons to be addressed during the appeals process. Because MDE failed to afford Bynum proper notice, MDE could not rely upon this conduct as a ground for terminating Bynum.

G. Bynum's travel expense voucher.
¶ 86. The termination letter charged that Bynum submitted an erroneous reimbursement request for her hotel room at the 1997 AVA conference; the expense voucher requested that MDE reimburse Bynum an amount over the single room rate to cover the expense of two guests staying with Bynum in the hotel room. Dr. Thompson testified that this conduct violated the Group Three offense of "falsification of records, such as, but not limited to, vouchers, reports, time records, leave records, employment applications, or other official state documents."
¶ 87. Bynum testified that her two sisters stayed with her in the hotel room. She explained that, when she checked out of the hotel, she paid what she thought was the difference between the single room rate and the cost of her sisters' stay *106 in the room. She submitted a reimbursement request to MDE claiming $327.73, which she thought was the correct amount for MDE to reimburse. In its examination of the hotel bill attached to the voucher, MDE caught the mistake and reimbursed her at the single room rate, amounting to $218.73. When she received the reimbursement, Bynum did not notice that MDE had reimbursed her in an amount lower than what she had claimed on the voucher, and she did not hear anything else about the voucher until the 1999 investigation.
¶ 88. The hearing officer found that Bynum's submission of the incorrect voucher was a mistake, that there was no evidence of intent or attempt to deceive on Bynum's part, and that a simple examination of the voucher reflected the facts. The hearing officer found that Bynum never willfully violated S.P.B. policies. This finding was substantially supported by Bynum's testimony that she mistakenly claimed the wrong amount and by fact that, when Bynum submitted the voucher for payment, she included the hotel bill that reflected the true amount.
¶ 89. MDE argues that an employee need not act intentionally in order to commit the terminable offense of falsification of records. MDE submitted a copy of its policy stating that an employee's claim of expenditures above actual expenditures constitutes fraud. MDE contends that, because Bynum admitted her submission of an incorrect amount for reimbursement, Bynum committed the terminable offense of falsification of records.
¶ 90. We find that the hearing officer's decision that Bynum's conduct was not terminable because she did not act intentionally was supported by substantial evidence, was not arbitrary and capricious, and was within the power of the EAB. The hearing officer's decision encompassed an interpretation of the offense of falsification of records requiring that the employee submit the false document with intent to deceive. This Court defers to an agency's interpretation of its own statutes and rules unless the agency interpretation contravenes the statutory language. Gill v. Miss. Dep't of Wildlife Conservation, 574 So.2d 586, 593 (Miss.1990).
¶ 91. We find that the hearing officer's interpretation of the offense of falsification of records as not including mistakes made without intent to deceive was one reasonable interpretation of the rule. In Mississippi Employment Security Commission v. Culbertson, 832 So.2d at 522(¶ 2), several employees appealed the Mississippi Employment Security Commission's failure to promote them. The EAB awarded the promotions to the employees. Id. MESC argued that it did not promote two of the employees because they falsified educational information on their employment applications. Id. at 529(¶ 39). One employee testified that she ventured a guess as to her educational information on her application because she was unsure of the number of college credits she had received. Id. at (¶ 42). The supreme court held that the evidence showed "the `falsification' was not significant enough to require reversing the EAB's orders." Id. Bynum's commission of a simple mistake in submitting the voucher was comparable to the conduct at issue in Culbertson.
¶ 92. We hold that the hearing officer's finding that Bynum was not guilty of the terminable offense of falsification of records for her erroneous claim on the travel voucher was supported by substantial evidence and was not arbitrary and capricious.

H. Bynum's preparation of documents relating to Dr. Haynes's personal business ventures.
¶ 93. MDE charged that Bynum prepared documents for Dr. Haynes's personal *107 business ventures. MDE found documents on Bynum's computer pertaining to Dr. Haynes's telephone card and vitamin sales businesses and concerning his church. Rhodes testified that the offense constituted the Group One offense of abuse of state time. We address this charge though a single Group One offense is not terminable. S.P.B. Rule 9.10(A) (Rev. 1999).
¶ 94. Bynum admitted that she had prepared the documents for Dr. Haynes on state time. She stated that Dr. Haynes's secretaries also worked on Dr. Haynes's personal business while at work at MDE. Bynum stated that she regularly worked overtime without pay and that, despite the occasional typing she performed for Dr. Haynes personally, she never failed to work a full forty hour week for MDE. The hearing officer found that Bynum's performance of work for Dr. Haynes reflected on Dr. Haynes, not on Bynum, and that Bynum did not abuse state time. That finding was supported by substantial evidence in that Bynum testified that she made up any time spent on work for Dr. Haynes by working overtime at MDE without pay.

I. Bynum's e-mails to local coordinators.
¶ 95. Finally, MDE charged that Bynum sent e-mails to local WBL coordinators that were critical of Dr. James Sardin, who replaced Dr. Myers as the Associate Superintendent of Vocational Education. In a 1999 e-mail to the local coordinators, Bynum stated that, based on her meeting with Dr. Sardin, she doubted that WBL would be getting new equipment that year. She stated that she would like for each local coordinator "to bombard Mr. Sardin's office with what's going on at your campus" to "show him the impact we have." She stated that it was very disappointing to be told that one would get something repeatedly and then be denied because "they don't understand what we do or why we do it." She sent another e-mail cancelling a planned trip to Germany because Dr. Sardin did not approve Dr. Haynes's participation and Bynum was unwilling to host the trip alone. That e-mail stated that Bynum had "no idea" why Dr. Sardin disapproved Dr. Haynes for the trip.
¶ 96. Rhodes testified that this violated the Group Two offense of "insubordination, including, but not limited to, resisting management directives through actions and/or verbal exchange, and/or failure or refusal to follow supervisor's instructions, perform assigned work, or otherwise comply with applicable established written policy." Bynum testified that Dr. Myers had promised equipment upgrades for WBL prior to his leaving MDE. When Dr. Sardin arrived, he denied the upgrades. Bynum said that she sent the e-mail instructing the local coordinators to "bombard Dr. Sardin's office" in an effort to make Dr. Sardin understand WBL and its importance as a program. The hearing officer weighed the evidence and the testimony and found that Bynum's e-mails evinced frustration, not insubordination. We find that the content of Bynum's e-mails and her explanatory testimony was substantial evidence from which the hearing officer could conclude that Bynum was not insubordinate. Further, a Group Two offense, alone, is not a ground for termination.

J. Bynum's deletion of files from her computer.
¶ 97. At the hearing, MDE alleged that Bynum deleted files from her computer by running a program known as "clean sweep." The hearing officer found from the testimony that Bynum did not perform a clean sweep. We do not consider this reason for terminating Bynum because *108 it was not listed in the termination letter. Miss.Code Ann. § 25-9-127(1) (Rev.2003).

CONCLUSION
¶ 98. Having found that two of the hearing officer's conclusions, as affirmed by the EAB, were not supported by substantial evidence, were arbitrary and capricious, or were beyond the power of the EAB, we affirm the decision of the circuit court reinstating Bynum's termination.
¶ 99. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES AND LEE, P.JJ., IRVING, MYERS, BARNES AND ISHEE, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY. GRIFFIS, J., NOT PARTICIPATING.
NOTES
[1] We note that it was virtually undisputed that CLW software in fact met the requirements of the WBL program. MDE's concerns about CLW software centered upon its position that the software was presented to the local coordinators as the only software available though no determination had ever been made that CLW software was the only obtainable software meeting the WBL requirements.