# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-SA-00972-COA

SAMMY WILLIAM RAY                                                                    APPELLANT

v.

MISSISSIPPI DEPARTMENT OF PUBLIC                                          APPELLEE
SAFETY

DATE OF JUDGMENT:              05/23/2013
TRIAL JUDGE:                   HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED:     HINDS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        JEFFERY P. REYNOLDS
ATTORNEY FOR APPELLEE:         TIMOTHY DAVIS SMITH
NATURE OF THE CASE:            CIVIL - STATE BOARDS AND AGENCIES
TRIAL COURT DISPOSITION:       AFFIRMED TERMINATION
DISPOSITION:                   REVERSED AND REMANDED - 10/21/2014
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BARNES, J., FOR THE COURT:**

¶1.     Trooper First Class Sammy Ray joined the Mississippi Highway Safety Patrol (a component of the Department of Public Safety and hereafter referred to as the "Highway Patrol" or the "Department") in 2003. During the summer of 2009, Ray issued tickets to four motorists, which formed the basis of charges leading to his dismissal from the Highway Patrol for falsifying documents. Ray appealed the dismissal to the Employee Appeals Board (EAB), where the hearing officer upheld the termination. Ray appealed to the full EAB, which also affirmed his termination. Ray next appealed to the Hinds County Circuit Court, which likewise affirmed the EAB's decision.

¶2.    Ray now appeals to this Court, claiming wrongful termination and seeking reinstatement.  Ray raises four issues on appeal:

1.    A Mississippi Department of Employment Security ruling that Ray had not committed misconduct collaterally estopped the Department of Public Safety from finding that Ray falsified records.

2.    The hearing officer erroneously considered evidence other than the four tickets with which Ray was charged and upheld the termination on the basis of the uncharged conduct.

3.    The termination was based on the wrong legal standard, which removed the intent-to-defraud element.

4.    The EAB ruling was not supported by substantial evidence.

    A.    There was no record support for the four specific violations.

    B.    Ray's conduct was distinguishable from other cases involving termination.

Upon review, we agree that Ray was terminated for conduct other than that with which he was charged and that his due-process rights were violated.  The Department has conceded that it has no other proof of the specific charged offenses, and we further find there is no substantial evidence to support the EAB's ruling.  *See LaCour v. Claiborne Cnty. Sch. Dist.*, 119 So. 3d 1128, 1132 (¶20) (Miss. Ct. App. 2013) (An administrative agency's decision will not be disturbed "unless the order . . . is not supported by substantial evidence[.]").  Accordingly, we reverse the circuit court's decision, upholding Ray's termination, and remand for further proceedings consistent with this opinion.

**FACTS**

¶3.    The charges against Ray were limited to his encounters with four specific motorists:

2

Kacie Patterson, Joshua Ulmer, William Thomas, and Sandra Carpenter.[1] Ray was charged, on these four specific occasions, with falsification of records by using personal information from the motorists he stopped and ticketed, to write additional "ghost tickets." The Performance Review Board, which terminated Ray, made no findings of fact, other than that the charges were "founded."

¶4. Between his termination in January 2010, and his hearing before the EAB hearing officer in January 2011, Ray had a hearing before the Mississippi Department of Employment Security (MDES). Ray was awarded unemployment benefits. The Highway Patrol appealed, and an administrative law judge found that the Highway Patrol had failed to prove by clear and convincing evidence that Ray had engaged in misconduct and affirmed the award of unemployment compensation to Ray.[2]

¶5. Ray received a de novo trial before an EAB hearing officer, where the following facts were developed. Although there is no regulation defining "ghost tickets," testimony at Ray's hearing established that it was generally understood to mean a trooper's writing of tickets for offenses that never occurred.[3] There are no regulations forbidding writing ghost tickets, but the parties agree that writing tickets for fictitious offenses is falsification of records and is

[1] Although the motorists were not named in the "narrative Statement of Charges" served on Ray, the Department's witnesses testified that the charges against Ray were limited to these four named motorists.

[2] Ray was thereafter hired as a police officer by the Petal Police Department, having denied falsifying tickets and passing a polygraph examination that questioned him on the reasons for his termination from the Highway Patrol.

[3] In Highway Patrol lore, it apparently began with troopers visiting a cemetery and getting names for tickets from tombstones.

3

a terminable offense. Throughout these proceedings, Ray has denied doing this.

¶6. During Ray's termination proceedings, the Department identified four prior instances of troopers writing ghost tickets, which led to their terminations. Ronald Wilburn was terminated in 1996, for writing tickets for offenses that had not occurred to motorists after they left traffic stops, which he would then attempt to dismiss after they were turned in to the court. This resulted in motorists having charges lodged against them of which they had no notice. Wilburn's termination was upheld in *Wilburn v. Mississippi Highway Safety Patrol*, 795 So. 2d 575, 578 (¶11) (Miss. Ct. App. 2001). William Berry was terminated in 1999, for issuing numerous tickets to individuals who were unaware that they were being given a ticket. An audit of Berry's tickets for a five-month period revealed that 212 out of 345 citations fell into this category. Berry would turn the tickets in to the court, and the motorists would have to pay fines for offenses of which they were unaware. John Butcher was terminated in 2002, for turning in reports to his supervisors claiming 537 tickets written while only filing four tickets with the court. Jerry Merrill was terminated in 2009, for fondling a female motorist's breast during a traffic stop, not turning over seized drugs, and writing tickets days after a motorist had been stopped that were not for legitimate offenses.

¶7. The Department contended that Ray also had written "ghost tickets" for which there was no valid offense, in an attempt to "pad" or increase his ticket numbers. Ray was accused of violating Department of Public Safety General Order 23/01, III, B., 3, d.[4] The offense outlined in this section is the: "falsification of records, such as, but not limited to, vouchers,

---

[4] The investigation began after a review was conducted of the ticket-writing practices for Ray's Troop, Troop J, which followed the termination of Trooper Jerry Merrill.

4

reports, leave records, employment applications, or other official state documents." The penalties for a group III offense include termination.[5]

¶8. All witnesses testified that there is no "quota system" requiring troopers to write a certain number of tickets. The testimony at the hearing made it abundantly clear, however, that troopers felt pressure from their supervisors to "keep their numbers up." Department witnesses testified that this simply meant "do your job" and that there were plenty of offenses on the roads justifying tickets for diligent troopers. A former trooper testified that troopers could be punished for not keeping their number up by being put on "directed patrol" or "line patrol."[6]

¶9. There are four copies of each sequentially numbered ticket written. One copy goes to the Commissioner of the Highway Patrol; one copy goes to the justice court; one copy is the officer's copy which goes to his master sergeant along with the trooper's ticket-control sheet; and the final copy is for the motorist. The ticket-control sheet lists all tickets, whether they are voided or not.

¶10. Ray testified that, on occasion, he would write "warning" tickets, and that for these warning tickets, Ray would write "void" on the justice court and Commissioner's copies and not write "void" on the motorist copy or the copy turned in to the master sergeant. Since his tickets to the justice court were "voided," no adverse consequences were possible for the

---

[5] Ray was also charged with insubordination for showing up to work an accident out of uniform. Although Ray admitted this infraction, it was not a terminable offense and is not at issue in this appeal.

[6] This required the trooper to be at designated places during his shift and to report his location throughout his shift.

motorists. Ray would shred the undelivered motorist's copy of his voided tickets. Ray and other witnesses testified that it is a common practice, when giving out warning tickets, not to hand the ticket physically to the motorist because it causes confusion about whether the motorist had to respond to the ticket. Ray did not conceal that he was writing "void" tickets. Although he failed to write "void" on the tickets he turned in to his master sergeant, he did indicate that the tickets were voided on his ticket-control sheets that accompanied the actual copies of the tickets. Ray presented the testimony of several former troopers, some in supervisory positions, that it was a generally accepted practice to write warning tickets and then "void" the ticket when it was turned in to the justice court so that the motorist faced no penalties. Witnesses testified that this was done as a good-will "community relations" tool. Ray, and other witnesses, testified that they also did this on occasion when they were not "100% sure" that an offense had been committed (e.g., thinking that a motorist was not wearing a seat belt, but upon stopping, the motorist had the seat belt on and told the trooper that he or she had been wearing it).

¶11. Retired Colonel Michael Berthay testified that warning tickets were not issued by troopers, but every other witness testified that it was a common practice. An email dated October 19, 2009, from Major Rusty Brill to "all Captains" discusses the practice of writing warning tickets and states that it will no longer be done while troopers are on "call back."[7] Thus, the discontinuance of the practice of writing and voiding warning tickets was discussed in October 2009, indicating it was not forbidden during the time Ray wrote the tickets that

_____

[7] "Call backs" are when troopers work overtime shifts, and they involve federal funding.

6

led to his charges.[8] Colonel Berthay testified that even a warning ticket should never be written if an officer is not certain an offense took place, but he also testified that, if a ticket had been written that an officer was not sure of, then it should be "voided."

¶12.  Ray's former coworkers and supervisor testified that he was a very competent and professional trooper. Don Berry, lieutenant colonel and deputy director of the Uniform Division of the Highway Patrol, testified that Ray's personnel file indicated that he had been promoted, had received a commendation and an award, and had received complimentary letters from citizens concerning his professionalism.

¶13.  Ray testified that he did not recall the four sets of tickets at issue, and the Department put on no proof that the tickets Ray voided for Patterson, Ulmer, Thomas, and Carpenter were "ghost tickets" for offenses Ray did not observe. Instead, the Department relied on statements Ray made to the investigator about other tickets he had written over his six-year career. In his October 26, 2009 written statement, Ray stated:

> During this interview I have admitted to the writing of 20-25 tickets that were seat belt tickets and some of the tickets that I issued were not valid tickets (seat belt tickets). These tickets were turned in to the [j]ustice [c]ourt and turned in along with my weekly reports. All seat belt tickets were voided when they were turned in to [j]ustice [c]ourt.

A transcript of the October 26 recorded interview, played at the hearing, shows:

> Q:  Okay, so, just to make sure that what we are talking about it – you make a – you make a good actual stop for say speeding and the individual has their seat belt on and you just write a no seat belt

---

[8] The email reads: "No warning tickets issued on Call Backs period. If you want to warn someone then give them a verbal warning. I think that this will be a good policy for all tickets, no warnings or voided tickets issued either write them or let them go with a verbal warning."

7

> violation and void it?
>
> RAY: Yeah.
>
> . . .
>
> Q.      And you count those on your activity sheet?
>
> RAY: Yeah.

¶14.    In his November 13, 2009 written statement, Ray stated: "During the time I have been employed with the [Department], I have written 20-25 tickets that may or may not be factual tickets.  These tickets were seat belt violations.  This was done to increase my ticket activity."  A transcript of the November 13th recorded interview, played at the hearing, shows:

> Q.      [W]hat were those violations for?  Where the tickets were made up or just added tickets on to someone – using someone's information just writing another ticket even though the violation didn't occur?
>
> RAY: Once I had that person stopped possibly for speeding or whatever violation may [sic] occurred, I wrote a seat belt ticket for that also.
>
> . . .
>
> Q.      [W]hat transpired [sic] you to just add extra tickets?
>
> RAY: I was just trying to get my numbers up.

When asked why he would do this, Ray replied:  "Poor judgment."

¶15.    Ray testified that he did remember the twenty to twenty-five instances he spoke of and that the four motorists for which he was charged were not in that number.  The investigator for the Department also testified that the four charged incidents were not in the twenty to twenty-five instances that Ray admitted.

8

¶16.    Following the de novo hearing, the hearing officer made no findings of fact about the tickets issued to the four named motorists. Rather, the hearing officer found generally that Ray would stop motorists and issue a ticket, and that he would write additional tickets, which he recorded on his ticket-control sheets but did not give to the motorists. The order noted that, on two occasions, Ray admitted to the investigator that he had written twenty to twenty-five seat belt violation tickets that were not "valid," or were "not factual." As to the four motorists Ray was charged with, the order reflected only:

> Joshua Ulmer, William Thomas, and Sandra Carpenter gave statements, and eventually sworn affidavits, acknowledging that they had been stopped by Ray, but had not received copies of all of the tickets that Ray had turned in and voided on his ticket control sheet. Kaci [sic][Patterson] also gave a statement to Investigator Mansell.

There was no finding that Ray falsified any of the tickets issued to these four motorists. The order concluded:

> With regard to the allegation of falsification of records the evidence supports a finding that the reasons given for the Agency's decision were in fact true. There is ample evidence that Ray wrote tickets that were not for actual violations and that were not intended to be prosecuted, but were used only to increase the number of tickets that he was credited with writing.

¶17.    In its order affirming the hearing officer, the full EAB ruled:

> The facts of this case clearly show that Ray issued tickets to motorists for violations that did not exist or that he was "unsure" existed, namely seat belt violations. Ray argued that these were "warning" or "voided" tickets and that he did not try to hide writing the tickets. However, the fact that he wrote tickets, whether it be one, four, or twenty, and was either unsure of the violation or made up the violation is an act of falsifying information on an official state document. That he voided the tickets and allegedly did not try to hide his actions is irrelevant as the act of knowingly writing a false ticket was committed. Further, Ray admitted that he wrote the tickets to increase the number of tickets he was credited with writing. These acts by Ray clearly constitute a Falsification of an Official State Document[,] which is a Group

9

Three Offense subject to discipline by termination.

¶18.    The circuit court's order affirming the termination found that Ray falsified an official state document "by knowingly writing tickets when he was unsure if a violation had occurred and by creating false violations."  Like the hearing officer and the full EAB before it, the circuit court made no finding that Ray falsified any of the tickets he issued to Patterson, Ulmer, Thomas, or Carpenter.

## STANDARD OF REVIEW

¶19.    State employees have a statutory right to appeal terminations to the EAB.  *See* Miss. Code Ann. § 25-9-131(1) (Rev. 2010).  There, they bear the burden of proof to show that the reasons given for termination are not true or that they do not justify termination.  *Bynum v. Miss. Dep't of Educ.*, 906 So. 2d 81, 90 (¶¶13-14) (Miss. Ct. App. 2004).  Mississippi Code Annotated section 25-9-127(1) (Rev. 2010) provides that on appeal, an employee who receives a notice of dismissal is "required to furnish evidence that the reasons stated in the notice of dismissal . . . are not true or are not sufficient grounds for the action taken."  Rule XXI B of the Employee Appeals Board Administrative Rules (2010) provides:

> The appealing party shall have the burden of proving that the action taken against the employee is arbitrary or capricious, not supported by any substantial evidence or in violation of some statutory or constitutional right and merits the relief requested.

Rule XXI C provides:

> An appealing party who is a permanent State Service employee and who has by written notice been dismissed or otherwise adversely affected as to his or her compensation or employment status shall be required to furnish evidence that the reasons stated in the notice of such action are not true or are not sufficient grounds for the action taken.

¶20. Appeals of EAB decisions may be taken to the circuit court. *Bynum*, 906 So. 2d at 90 (¶¶13-14). The standard of review for appeals of EAB decisions to the circuit court, and from there, to the court of appeals, is set by statute. Miss. Code Ann. § 25-9-132 (Rev. 2010).

> The standard of review of this Court is identical to that of the circuit court. . . . We must affirm the agency decision if that decision was (1) supported by substantial evidence; (2) not arbitrary or capricious; (3) within the scope or power of the agency; and (4) not in violation of a party's constitutional or statutory rights.

*Bynum,* 906 So. 2d at 90 (¶16) (citations omitted). "[W]here an administrative agency errs as a matter of law, courts of competent jurisdiction should not hesitate to intervene." *Miss. Dep't of Human Servs. v. McNeel*, 10 So. 3d 444, 451 n.6 (Miss. 2009).

## DISCUSSION

### I. Collateral Estoppel

¶21. In May 2010, the MDES affirmed an award of unemployment compensation to Ray, finding that "the employer has failed to show with clear and convincing evidence that the claimant's actions arose to the level of misconduct." Citing *Bertucci v. Mississippi Department of Corrections*, 597 So. 2d 643 (Miss. 1992), Ray argues that the MDES's ruling that he did not commit misconduct collaterally estops the EAB from upholding his termination.[9]

¶22. In *Bertucci*, the Mississippi Department of Corrections (MDOC) fired an employee

---

[9] The Department failed to address this argument in its brief. This omission constitutes grounds to rule against the Department on this point. *See Turner v. State*, 383 So. 2d 489, 491 (Miss. 1980) (trial court reversed where appellee failed to address arguments of appellant).

11

for falsifying records. *Id.* at 644. She was awarded unemployment compensation after a hearing in which the sole issue was whether she had falsified records. She was indicted in Harrison County for falsifying records, but the circuit court dismissed the indictment on the ground of collateral estoppel because the key factual issue had already been determined by an administrative agency in favor of Bertucci. *Id.* Bertucci appealed her termination, and the full EAB ruled that "MDOC was collaterally estopped from relying on its claim of document falsification as grounds for job termination because that fact issue had been determined by a competent state agency." *Id.* at 645. After MDOC appealed to circuit court, the circuit court ruled that collateral estoppel did not apply because the burden of proof is on the employer in employment security hearings, but is on the employee in EAB proceedings. *Id.* Following an appeal by Bertucci, the Mississippi Supreme Court dismissed the appeal because MDOC lacked statutory authority to appeal. *Id.* at 647. The supreme court, therefore, never addressed the merits of this argument. The dismissal of the appeal left the EAB's ruling applying collateral estoppel intact.

¶23. We first note that this issue was raised by Ray at every stage of these proceedings, but was not ruled on by the EAB or by the circuit court. We further note that different statutory schemes cover the MDES and the EAB. *Compare* Miss. Code Ann. §71-5-1 (Rev. 2011), *et. seq.* (MDES), *with* Miss. Code Ann. § 25-9-120 (Rev. 2010), *et. seq.* (EAB). Each has a different mission and a different burden of proof. In MDES cases, the burden is on the

12

employer,[10] whereas in EAB cases, the burden is on the employee.[11]  Although the Department did not brief this issue, the Department's counsel pointed out in oral argument that applying collateral estoppel in cases where there had first been a denial of benefits by the MDES would deprive employees of their statutory right to contest their dismissal with their employing agency.  Given the difference in statutory schemes, and with no supreme court authority on point, we decline to rule on the basis of collateral estoppel, despite the Department's failure to address the issue in its brief.

## II.     Due Process

¶24.    Ray argues that the hearing officer, the full EAB, and the circuit court all violated his statutory and constitutional rights to due process by considering and relying upon evidence outside of the charges for which he was terminated.[12]  Over Ray's repeated objections, the hearing officer considered evidence not specifically limited to the tickets issued to the four motorists for whom Ray was charged.[13]  Most damning to Ray's defense were his admissions to writing twenty to twenty-five tickets that "may or may not" have been "valid," or "factual."  These admissions were relied on by the hearing officer in her order.

¶25.    Due process requires that an accused be informed of the charges and that any

---

[10] *See Jackson Cnty. Bd. of Sup'rs v. Miss. Emp't Sec. Comm'n*, 129 So. 3d 178, 183 (¶12) (Miss. 2013).

[11] *See Miss. Forestry Comm'n v. Oglesby*, 105 So. 3d 375, 380 (¶11) (Miss. Ct. App. 2012).

[12] The Department also failed to address this argument in its brief.  Rather than consider the issue forfeited, we exercise our discretion and consider the issue on its merits.

[13] Ray's counsel argues that he was "blind sided" at the hearing, having come prepared only to defend against the tickets related to the four specific motorists.

13

disciplinary action be based on violations related to the specific charges levied against the employee. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (employees have due process rights prior to termination, which include "notice and opportunity for hearing."); *In re Ruffalo*, 390 U.S. 544, 550-51 (1968) (where attorney in disbarment proceedings had no notice that employment of certain person would be considered a disbarment offense until after both he and that person had testified, absence of fair notice as to reach of grievance procedure and precise nature of charges deprived attorney of procedural due process).

¶26.   Section 25-9-127(1) of the Mississippi Code Annotated, provides:  "No employee . . . may be dismissed . . . except for . . . good cause, and after written notice and hearing . . . as shall be specified in the rules and regulations of the State Personnel Board complying with due process of law . . . ."  Mississippi Code Annotated section 25-9-129 (Rev. 2010) creates the EAB process.  Discharged employees are statutorily entitled to due process in their appeals to the EAB.  Under Mississippi Code Annotated section 25-9-131 (Rev. 2010), employees "shall be afforded all applicable safeguards of procedural due process."  The applicable rule in this case is EAB Administrative Rule XVIII (D), which provides:  "The Presiding Hearing Officer shall hear or receive evidence *only on those reasons and allegations contained in the responding agency's final disciplinary notice to the employee of such action*."  (Emphasis added).

¶27.   During the investigation, Ray was never questioned regarding the stops involving Thomas or Carpenter.  When asked about the Ulmer stop, all Ray could remember was that it possibly involved a seat belt or speeding violation.  Ray had no memory of the Patterson

14

stop. Since Ray did not admit to writing false tickets for the four motorists, we have examined the record to determine if the actual tickets, and the witnesses' statements concerning these four motorists, prove that any of the tickets were fictitious "ghost tickets."

¶28. Ray wrote two tickets to Patterson on June 3, 2009: one for speeding, and one for a seat belt violation. The ticket-control sheet indicated that both were voided. Patterson told the investigator that she was, in fact, speeding and given a warning for that. She stated that she was wearing her seat belt. The Department does not explain why, if Ray was only attempting to "pad his numbers," he voided the ticket for the admitted speeding violation. These facts do not support the conclusion that Ray wrote and voided a ticket for an offense he did not observe.

¶29. Ray wrote two tickets for Ulmer on June 22, 2009: one was for speeding, and one was for a seat belt violation. The ticket-control sheet indicated that both were voided. Ulmer initially told the investigator that he got a ticket for not wearing his seat belt, but not a speeding ticket. In a subsequent affidavit admitted into evidence, Ulmer said that, in addition to the seat belt violation, he was possibly speeding and got a warning for it. These facts do not support the conclusion that Ray wrote and voided a ticket for an offense he did not observe.

¶30. Ray wrote three tickets for Thomas on June 27, 2009. speeding, a seat belt violation, and an inspection-sticker violation. The ticket-control sheet indicated all three were voided. Thomas told the investigator that he did not receive any tickets. In a subsequent affidavit admitted into evidence, Thomas said he was pulled over for speeding, and he may also have received a warning for a seat belt violation. These facts do not support the conclusion that

15

Ray wrote and voided a ticket for an offense he did not observe.

¶31.    Ray wrote Carpenter two tickets on July 15, 2009:  one was for a seat belt violation, and one was for an inspection-sticker violation.  The ticket-control sheet indicated that the seat belt ticket was voided.  Carpenter told the investigator she got an inspection-sticker ticket, but not a seat belt ticket.  In a subsequent affidavit admitted into evidence, Carpenter stated that she may have removed her seat belt when the officer approached.  These facts do not support the conclusion that Ray wrote and voided a ticket for an offense he did not observe.

¶32.    During oral argument before this Court, the Department could point to nothing connected to the four stops showing that they involved ghost tickets, and conceded that it had no evidence of false tickets other than Ray's statements.  In its appellee's brief, the Department states that "[i]t was suspected, but never proven, that Ray executed far more falsified tickets than [he was] charged with."  Therein lies the problem.  Ray's statements provide the only evidence of falsified tickets, and those statements do not relate to the four charged instances.  The Department's suspicion comes from Ray's statements concerning uncharged conduct.  There is no proof as to the four charged instances.

¶33.    The dissent relies primarily on two arguments. First, the dissent points out that Ray turned in seat belt violation tickets and speeding tickets, which he did not hand to Patterson, Thomas, Carpenter, and Ulmer.  In the light of testimony that troopers sometimes refrain from handing warning tickets to motorists to avoid confusing them, this does not establish that these tickets were fraudulent.

¶34.    Second, the dissent states:

16

> The tickets for the seat belt violations that Ray wrote for Patterson, Thomas, and Carpenter had to be included in the twenty to twenty-five tickets for seat belt violations that he wrote, as the evidence is clear that Ray wrote only twenty to twenty-five fraudulent tickets for seat belt violations in his entire career. And since both the hearing officer and the full Board found that Ray wrote false tickets for seat belt violations, how can it be said that the hearing officer and the full Board did not find that Ray falsified tickets for these four individuals?

Neither the hearing officer nor the full EAB made any findings of fact about the tickets issued to the specific four motorists at issue. The investigating officer testified that the tickets issued to the four named motorists were *not* included in the twenty to twenty-five instances to which Ray admitted. Ray never admitted that he falsified tickets to these four motorists. Close examination of the statements from the four motorists fails to show that Ray issued them tickets for offenses he did not observe.

¶35. In *Bynum*, 906 So. 2d at 105 (¶85), this Court noted that an employing agency may not rely on conduct that was not the subject of the termination notice to justify a termination. "Because [the Mississippi Department of Education] failed to afford Bynum proper notice, [it] could not rely upon this conduct as a ground for terminating Bynum." *Id.* Ray's termination has been upheld at each stage of this proceeding on the basis of his apparent admission to writing tickets for non-offenses. This admission was not specific to the four actual charged offenses, however, and there was no other direct proof that any of these tickets were fraudulent.

¶36. Accordingly, we find the denial of Ray's statutory due-process rights mandates reversal of the agency's actions. *McNeel*, 10 So. 3d at 451 n.6 ("Where an administrative agency errs as a matter of law, courts of competent jurisdiction should not hesitate to

17

intervene." (citing *Grant Ctr. Hosp. Inc. v. Health Grp. of Jackson Inc.*, 528 So. 2d 804, 808 (Miss. 1988))). Determining that Ray is entitled to reinstatement with the Highway Patrol and to an award of full back pay and benefits, we reverse and remand to the circuit court for further proceedings consistent with this opinion. *See Hamilton v. Pulaski Cnty. Special Sch. Dist.*, 900 S.W.2d 205, 209 (Ark. 1995) (reversing circuit court's order and "remanding with instructions that an order be entered reinstating [plaintiff] to his coaching position with appropriate back pay"); *Ritter v. Woonsocket Sch. Dist.*, 504 N.W.2d 572, 577 (S.D. 1993) (reversing and remanding to circuit court "to order reinstatement [of plaintiff as head basketball coach] and to determine the amount of back pay"); *Kirkwood v. City of Corsicana*, 871 S.W.2d 544, 547-48 (Tex. Ct. App. 1994) (remanding to trial court for reinstatement of the plaintiff to his position as police captain and "an award of back pay"). All remaining issues are rendered moot by our holding.

¶37. **THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., ISHEE, ROBERTS AND FAIR, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. JAMES, J. CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, P.J., AND MAXWELL, J.**

**IRVING, P.J., DISSENTING:**

¶38. The majority finds that the Department terminated Ray's employment for conduct other than that for which he was charged and, therefore, violated his due-process rights. More specifically, the majority finds that neither the hearing officer nor the full EAB or the

18

circuit court found that Ray falsified any of the tickets he issued for Patterson, Ulmer, Thomas, or Carpenter. In my opinion, the majority's finding—that neither the hearing officer nor the full EAB found that Ray falsified any of the tickets he issued for Patterson, Ulmer, Thomas, or Carpenter—represents an unjustified and excessively narrow reading of the orders of the hearing officer and the full EAB that is not supported by the record. It is clear to me that both the hearing officer and the full EAB found that Ray wrote twenty to twenty-five fraudulent tickets that included the fraudulent tickets that he wrote for Patterson, Ulmer, Thomas, and Carpenter. Therefore, I dissent. I would affirm the judgment of the Circuit Court of Hinds County, which affirmed the order of the full EAB, terminating Ray's employment.

¶39. It is important to establish what Ray was charged with. To do so, I quote verbatim from the statement of charges filed by Captain Richard Watkins, Commander Troop J of the Southern Enforcement District:

> TFC Sammy Ray, a sworn officer, did violate DPS [(Department of Public Safety)] General Order 23/01, III. B. 2., a. (Group Two Offense) in view of General Order 05/02 and B. 3., d., (Group Three Offense), to wit:
>
> a.   insubordination, including but not limited to resisting management directives through actions and/or verbal exchange, and/or failure to follow supervisor's instructions, perform assigned work, or otherwise comply with applicable established written policy;
>
> and,
>
> d.   falsification of records, such as, but not limited to, vouchers, reports, time records, leave records, employment applications,

19

or other official state documents.[14]

FACTS

On September 21, 2009[,] the Internal Affairs Division of the MHP was advised to conduct an investigation regarding an allegation of conduct on TFC Sammy Ray. The allegation was that TFC Ray may have been falsifying state documents on his Ticket Control Sheets.

(Group Three Offense - Four Counts - Falsification of Records)

Through investigation into the allegations against Ray it was discovered that on four (4) separate occasions he had written false tickets, otherwise known as "ghost tickets" on people that he had encountered on the road. Ray would issue a citation to an individual and obtain the personal information. He may issue a lone citation and then with the individual's personnel information write an additional charge that would be entered on his ticket control sheet to make it appear as though he was writing more tickets than he actually was at the time. In doing so, Ray was falsifying official state documents, which is a Group Three Offense. He did this on four (4) occasions resulting in four (4) separate Group Three charges for falsification of records.

(Group Two Offense - One Count - Insubordination)

During the course of the investigation into allegations of falsifying documents against Ray it was discovered that on August 8, 2009, TFC Ray was dispatched to a wreck on Interstate 59. Ray was not wearing his Class A uniform. Instead, Ray was wearing a MHP t-shirt, MHP hat, shorts and sandals. While investigating the accident, Ray made an arrest for DUI and transported the individual to the Jones County Detention Center. This is a direct violation of General Order 05/02 which in turn makes Ray guilty of insubordination, which is a Group Two Offense.

Based upon the above, it is evident that the actions alleged herein are in violation of departmental rules and regulations, being DPS General Order 23/01, III, B. 3., d. (Group Three Offense - Four Counts), and B. 2., a. (Group Two Offense - One Count). Therefore, it is my belief that TFC Sammy Ray, J-23, a sworn officer of the Mississippi Highway Safety Patrol, should be subjected to a Performance Review Board Hearing pursuant to the provisions of DPS General, Order 24/05, with the allegations contained herein heard as

---

[14] This appeal involves the charge of falsification of records, or other official state documents. The insubordination charge was dismissed by the hearing officer.

20

One Group Two Offense and Four Group Three Offenses therein.

¶40. As noted, Ray was charged with falsification of records, or other official state documents. Therefore, it is critical that there be a clear understanding of exactly what Ray did and how the Department classifies that action. The charging statement did not set forth the specifics of the falsification. The specifics were derived from the witnesses who testified on behalf of the Department, the first of whom being Lieutenant Colonel Don L. Berry.

¶41. Prior to Lieutenant Colonel Berry's testimony, counsel for the Department explained that the charge of falsification of records involved writing false tickets and that in the vernacular of the Highway Patrol, those are called "ghost tickets." He further explained what the Department considers a false or ghost ticket:

> Basically what happens and what has happened in this case as well as past cases is the law enforcement officer will pull somebody over for a lawful purpose, such as speeding. At that point, [the officer] get[s] the individual's driver's information, their driver's license number, name, address, the information used on a ticket. [The officer] may write that person [a ticket] for the actual infraction . . . . At that point, the . . . trooper would write additional tickets such as seat belt violation or such as inspection sticker violation that did not take place. . . . The officer would then place these tickets, these fraudulent tickets[,] in addition to the actual ticket on [his] [t]icket [c]ontrol [s]heet. The [t]icket [c]ontrol [s]heet is, in a lot of ways, a reference as to how many tickets the [t]rooper is writing. The [t]rooper know[s] that these tickets do not make it to the Justice Court or through [the] in-process [at] the Justice Court. [The trooper] will then void [the] tickets that are fraudulent tickets. When [the] trooper's [supervisor] looks at the ticket control sheet, it makes it appear as though [the trooper] is writing more tickets than he is.

¶42. Lieutenant Colonel Berry testified that he was Deputy Director of the Uniform Division of the Highway Patrol and that he had been employed with the Mississippi Highway Patrol a little over thirty years. He testified that writing a fraudulent ticket is a group-three offense, the most severe offense, and that one group-three offense could lead to termination.

21

He affirmed that it was not normal practice for officers to get the personal information of a motorist and write a ticket for offenses that did not occur.

¶43. The next witness to testify was Master Sergeant Creede Mansell. Sergeant Mansell confirmed that Ray was charged with writing fraudulent tickets to only four individuals: Patterson, Thomas, Ulmer, and Carpenter. Sergeant Mansell identified a statement given by Patterson, which recited what occurred when she was pulled over by Ray. In the statement, Patterson said that she was wearing her seat belt when she was pulled over for speeding. She admitted to Ray that she had been speeding and apologized. Patterson said that Ray took her driver's license and returned a short time later. Ray did not give Patterson a ticket for anything but told her to slow down. However, Trooper Ray turned in two tickets written for Patterson, one for speeding and one for not wearing a seat belt. Neither ticket had the word "warning" written on it.

¶44. Sergeant Mansell also testified regarding the tickets that Ray issued to Thomas, Ulmer, and Carpenter. As to Thomas, Ray issued tickets for an expired inspection sticker, speeding, and a seat belt violation. Thomas gave a statement to Sergeant Mansell wherein he stated that he did not remember ever getting the speeding or expired-inspection-sticker ticket and that he was sure he never received a ticket for a seat belt violation.

¶45. According to Sergeant Mansell, Ray wrote two tickets for Ulmer: one for speeding and one for a seat belt violation. However, Ulmer gave a statement to Sergeant Mansell wherein he stated that Ray gave him a ticket for the seat belt violation but did not give him one for speeding and never mentioned anything about speeding to him.

¶46. Finally, Sergeant Mansell testified about the tickets that Ray issued to Carpenter.

22

Mansell stated that Ray wrote two tickets for Carpenter: one for an expired inspection sticker and one for a seat belt violation. Carpenter gave a statement affirming that Ray gave her a ticket for an expired inspection sticker. However, she stated that Ray did not give her a ticket for the seat belt violation.

¶47. Ray gave four statements: two in his handwriting and two in the form of a question-and-answer interview. In the first one, given on October 26, 2009, in interview form to Sergeant Mansell, Ray stated the following:

Q. Okay. Earlier we went over some of these citations, [Ray], where you had made traffic stops on individuals and then voided all tickets out and some of these actual citations were in fact true stops, is that correct?

A. Yes.

Q. Okay, and then on some of the -- some of the particular stops there may have been instances where there was a good violation, such as speeding or careless driving, something to that nature, and -- and then a seat belt violation would follow. In some of these situations, were the actual seat belt violations good violations or were they just tickets that were -- that you marked seat belt violations on there just -- just to -- just to mark it, is that kind of what you told me earlier?

A. Yes.

Q. Okay, and on how many situations would you say that occurred? That, you know that you can recall or—before you answer that, is it something that you did a couple of times, several times, or just throughout the course of each work schedule?

A. Several times.

Q. Okay. And if you had to put a number on it how many would you say?

A. I don't know a percentage or a number.

Q. Well, let me ask you this, would you -- would it be something that you would do, if you -- how many tickets do you write a month?

23

A.     70-75.

Q.     About 70 tickets, okay, so that's probably anywhere from 25 stops to 30 stops?

A.     Yeah.

Q.     Maybe. Out of those 30 stops in a month how many times would you say that it occurs?

A.     I don't know. Maybe three or four, I guess. I don't know.

Q.     So, three or four -- three or four times a month, so that would be -- would that be like every month?

A.     I guess 20 to 25 times a month, to put a number on it. I don't know.

Q.     Okay. So, and just -- just to make sure that what we are talking about it -- you make a -- you make a good actual stop for say speeding and the individual has their seat belt on and you just write a no[-]seat belt violation and void it?

A.     Yeah.

Q.     So, the ticket is actually voided?

A.     Yes.

Q.     Okay, it never goes to Justice Court or anything like that?

A.     No.

Q.     Okay. And you [--]

A.     It goes to Justice Court, I turn it in, but I turn it in as I voided the ticket.

Q.     Okay. And you count those on your activity sheet?

A.     Yeah.

Q.     Okay. Have you ever done that with any other charge other than a seat belt violation? I mean[.]

24

A.    No.

Q.    Nothing other than a seat belt, so we know no inspection stickers or what about insurance?

A.    No.

* * * *

Q.    Okay. But, it's only the seat belt violation that you -- that you charge or actual[ly] not charge them with that[;] you mark it on the citation then void it, right?

A.    Yes.

Q.    Okay. And you said you've done that probably about 25 times.

A.    Probably.

Following the interview, Ray wrote the following statement and gave it to Sergeant Mansell:

During this interview[,] I have admitted to the writing of 20-25 tickets that were seat belt tickets and some of the tickets that I issued were not valid tickets (seat belt tickets). These tickets were turned into [sic] the Justice Court and turned in along with my weekly reports. All seat belt tickets were voided when they were turned into [sic] the Justice Court.

¶48.   In the next statement that Ray gave to Sergeant Mansell, in interview form, Ray stated the following:

Q.    Alright. The -- the first time that I interviewed you -- can I just call you Sammy?

A.    Yeah.

Q.    Alright. The first time I conducted an interview with you was on, I believe October, I think it was the 22nd if I'm not mistaken, 26th, October 26th and during that interview we discussed the citations that you had written and particularly four that you had written where you made a traffic stop and for whatever violation and then at the end of the traffic stop you had added a -- a ticket even though that violation didn't

25

occur. And I believe the names were Sandra Carpenter, Josh Ulmer, William Thomas, and Kasey [sic] Patterson. Do you recall me showing you those citations during the last interview?

A.    Yes.

Q.    Okay, and after we went over those citations, I believe I asked you about how many times that you had done that in addition to the ones that we discussed and you said roughly 20 to 25 times. Do you recall saying that?

A.    Yes.

Q.    Okay. Would that be a fair estimate of the number of times that you -- that you did that?

A.    Yes.

Q.    Okay. And what -- what were those violations for? Where the tickets were made up or just added ticket on to someone -- using someone's information just writing another ticket even though the violation didn't occur?

A.    Once I had that person stopped possibly for speeding or whatever violation may [have] occurred, I wrote a seat belt ticket for that also.

Q.    Okay. So all of them were seat belt violations to the best that you can remember?

A.    Yeah.

Q.    Okay. Do you remember these two citations right here, that was Josh Ulmer, that was one for a seat belt violation and then a speeding?

A.    Yes.

Q.    Do you remember that citation?

A.    Somewhat.

Q.    Okay. And do you remember that one being one that you wrote a seat belt violation to or the speeding violation?

A.    Yeah, possibly.

Q.    And when -- when was the first time that -- that you recall writing the first citations?

A.    A month.

Q.    A month ago?

A.    No, no, I mean like a certain month or [--]

Q.    I mean, how long do you think that this has been going on is what I'm -- I'm asking?

A.    Over my career?  I'd say within the last couple of months.

Q.    Okay.  And what -- what brought that on.  I mean what -- what transpired [sic] you to just add extra tickets?

A.    I was just trying to get my numbers up.

* * * *

Q.    Well, let me ask you this, who -- who do you remember stopping and -- for a violation and then writing them a seat belt violation when they had it on or you just went back to the car and just wrote one just -- just to write it?  Do you recall anybody?

A.    No really, I -- I just know that I've done it that many times, you know, about that many times.

* * * *

A.    What's going to happen next?

Q.    I don't -- this is the only thing I do -- I do right here just the interview.  But just for  -- just for the record that and you -- you tell me if I am right or wrong but according to the last interview that we did, it was 20 to 25 tickets that you -- that you said that you know without a shadow of a doubt that you wrote where the violation was not there.  You just wrote an additional seat belt violation to the actual violation on that stop to increase your activity on your ticket control sheet?

27

A.    Yeah.

Following the above interview, Ray wrote the following statement and gave it to Sergeant Mansell: "During the time I have been employed with the MDPS, I have written 20-25 tickets that may or may not be factual tickets. These tickets were seat belt violations. This was done to increase my ticket activity."

¶49.    As to the charges brought against Ray, the Performance Review Board unanimously determined: "Group Three Offense (Four Counts)—(falsification of records, such as , but not limited to, vouchers reports, time records, leave records, employment applications or other official state documents) is founded." On appeal to the EAB, the hearing officer found the Department had sufficient grounds for terminating Ray. In arriving at this ultimate finding, the hearing officer also found:

> One of the methods of evaluating highway patrol officers is by the number of tickets they write.
>
> When Ray wrote the tickets at issue he would write "void" on the motorist copy and the court copy; he would then turn in the clean copy of the tickets to the master sergeant and shred the fourth copy.
>
> During the investigation into Ray's activities, he admitted to Internal Affairs Investigator, Creed Mansell, that on 20-25 occasions he had written tickets for seat belt violations which were not valid.
>
> * * **
>
> After his pre-termination hearing before the Performance Review Board of the Mississippi Highway Safety Patrol, "the board determined that four counts of Group Three Offense (falsification of record[s], such as but not limited to, vouchers, reports, time records, leave records. Employment applications[;] or other official state documents) is founded."

On appeal, to the full EAB, the full EAB found:

28

Pursuant to Mississippi Code Annotated section 63-9-21, a ticket written by a Mississippi highway patrol officer is an official state documents in which the officer swears that the information therein is correct. The facts of this case clearly show that Ray issued tickets to motorists for violations that did not exist or that he was "unsure" existed, namely seat belt violations. Ray argued that these were "warning" or "voided" tickets and that he did not try to hide writing the tickets. However, the fact that he wrote the tickets, whether it be one, four or twenty, and was either unsure of the violation or made up the violation is an act of falsifying information on an official state document. That he voided the tickets and allegedly did not try to hide his actions is irrelevant as the act of knowingly writing a false ticket was committed. Further, Ray admitted that he wrote the tickets to increase the number of tickets he was credited with writing. These acts by Ray clearly constitute a falsification of an official state document[,] which is a Group Three Offense, subject to discipline by termination.

¶50.    Based on the plethora of evidence that Ray turned in false tickets for four individuals who were identified at the beginning of the hearing, it is not clear to me why the majority finds that neither the hearing officer nor the full EAB found that Ray falsified any of the tickets he issued to those four individuals, namely: Patterson, Ulmer, Thomas, and Carpenter. I assume the majority bases its finding on its narrow reading of those orders. Regardless, in my judgment, the majority's finding is not borne out by this record. It is clear that Ray admitted to writing twenty to twenty-five fraudulent tickets for seat belt violations that did not occur. He also admitted that he had not written, in his entire career, more than that number for seat belt violations that had not occurred.

¶51.    The evidence is uncontradicted that Ray was the officer who wrote and turned in seat-belt-violation tickets for Patterson, Thomas, and Carpenter. He also wrote and turned in a speeding ticket for Ulmer that he did not give to Ulmer. The evidence is also uncontradicted that Patterson, Thomas, and Carpenter were not given a citation for a seat belt violation by Ray when he stopped them. Also, Ulmer stated that Ray did not give him a ticket for

29

speeding and never mentioned speeding to him; yet Ray wrote and turned in a speeding ticket for Ulmer. The tickets for the seat belt violations that Ray wrote for Patterson, Thomas, and Carpenter had to be included in the twenty to twenty-five tickets for seat belt violations that he wrote, as the evidence is clear that Ray wrote only twenty to twenty-five fraudulent tickets for seat belt violations in his entire career. And since both the hearing officer and the full EAB found that Ray wrote false tickets for seat beat violations, how can it be said that the hearing officer and full EAB did not find that Ray falsified the tickets for these four individuals? I should note the majority states that neither the hearing officer nor the full EAB found that the tickets Ray gave to Patterson, Thomas, Carpenter, and Ulmer were falsified. If the majority's finding and holding are based on the lack of findings with respect to falsification of tickets given to the four individuals, then the majority has failed to grasp the breadth of the charges leveled against Ray. The falsification involved tickets that were written by Ray and turned in to his superiors for violations that never occurred, not the tickets that were written for real violations and given to the violators.

¶52.    Finally, in my judgment, while the orders of the hearing officer and the full EAB do not make a specific finding that Ray wrote fraudulent tickets for any named individual, it is clear that the findings made in the orders refer to Ray's ticket-writing conduct with respect to Patterson, Thomas, Ulmer and Carpenter, as well as to his conduct generally with respect to fraudulent ticket writing involving other unnamed individuals. To find that the hearing officer and the full EAB did not find that, on four occasions, Ray falsified an official state document, a traffic ticket, by turning in false tickets for seat belt violations for Patterson, Thomas, Carpenter and Ulmer is to ignore the undisputed facts in this record and to read the

30

orders in a vacuum. I cannot do so. Therefore, I dissent. I would affirm the judgment of the Hinds County Circuit Court affirming the order of the full EAB terminating Ray from the Department.

**GRIFFIS, P.J., AND MAXWELL, J., JOIN THIS OPINION.**