# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-SA-00020-COA

**CARL SMITH**                                                              **APPELLANT**

**v.**

**MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY**                  **APPELLEE**

DATE OF JUDGMENT:               12/15/2020
TRIAL JUDGE:                    HON. ISADORE W. PATRICK JR.
COURT FROM WHICH APPEALED:      HINDS COUNTY CIRCUIT COURT,
                                FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:        DENNIS L. HORN
                                LEIGH KATHRYN PAYNE HORN
ATTORNEY FOR APPELLEE:          MICHAEL ERIC BROWN
NATURE OF THE CASE:             CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                    AFFIRMED - 05/10/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.

### McDONALD, J., FOR THE COURT:

¶1.    Carl Smith (Carl) appeals the Hinds County Circuit Court's judgment affirming the Mississippi Employee Appeals Board's (MEAB) decision that upheld Carl's termination from his position with the Mississippi Department of Public Safety (MDPS).  Having reviewed the record and arguments by the parties, we affirm the circuit court's decision that there was substantial evidence to support the termination.

### Facts

¶2.    Carl began working with the MDPS in 1999.  By 2016, he had risen to the rank of Master Sergeant with the Mississippi Bureau of Investigations (MBI), a division of the

Mississippi Highway Safety Patrol (MHSP), which is a division of the MDPS. Carl was also a major in the Army National Guard, which he joined in 1997 after serving in the Marines from 1992 to 1997.

¶3.     Carl married his wife, Kendyl, on August 12, 2014. They lived with her daughter (his stepdaughter), P.D.,[1] and their daughter, K.S., in Mississippi until May of 2016 when Carl was detailed by the Guard to Arlington, Virginia. Carl left for Virginia, and Kendyl and the children followed him shortly thereafter.

¶4.     According to Carl, when he and Kendyl were dating, Kendyl told him about her prior abuse of a medication, Adderall. After she assured him that she no longer had a drug-abuse problem, they married. However, after their move to Virginia, Carl said he saw Kendyl taking more than her prescribed dose of Adderall on several occasions. According to Carl, she also tried to visit different doctors to secure more Adderall after her prescriptions ran out.[2]

¶5.     Kendyl became dissatisfied with their life in Virginia, and her mental state declined due to her addiction to Adderall. After gaining employment at a bank and working for a day, she and the children returned to Mississippi on October 13, 2016. Carl only learned that she and the children had left when he returned from work that day.

¶6.     The marriage deteriorated after this in spite of the parties' attempts to reconcile. Although Carl was in Virginia, he admitted that he had Kendyl followed in Mississippi and

---

[1] To protect their privacy, the children will be referred to by their initials.

[2] The record does not reflect the condition for which Kendyl was taking this medication.

2

discovered several instances of her infidelity with different men. At the time, Carl had both a State-issued cell phone through the MBI and his personal cell phone with him. Carl admitted that after learning of Kendyl's infidelity, he called her and sent her multiple angry texts from both his State-issued cell phone and his personal cell phone. He felt Kendyl was misleading him because her unfaithfulness contradicted her words of love to him.

¶7. During this time, Carl sent Kendyl text messages from both phones and messages through a messaging app. He also sent emails and posted items concerning her on Facebook. The texts were full of expletives, demeaning language ("Idiot, you are the sorriest [expletive deleted] human being I've ever [expletive deleted] met." ) and veiled threats ("I'm filing extortion charges against you . . . . I'm going to make sure everybody knows every immoral and illegal thing you have ever done."). Carl said that he hated her and her whole "[expletive deleted]" family. In another text, he said that the MHSP could not do anything to him because he was on his own phone and on military leave: "I don't belong to them." Numerous times, Kendyl would not answer his calls, and the record contained pages of numerous repetitive calls, reflecting the harassing nature of Carl's communications. At one point, Kendyl messaged Carl to take down the accusations against her that he had put on Facebook, to which he responded that she should just kill herself and do their daughter a favor before she is exposed to diseases. Despite her request, Carl continued to post on Facebook that Kendyl had been unfaithful, saying, "she is working on number eight (that I know of) for the year! Names available on request!"

¶8. On February 28, 2017, Carl sent an email to Kendyl's father, Dwight Myrick; her

3

mother; and her sister in which he essentially expressed his frustration and anger with Kendyl. In this email, he referred to several instances of Kendyl's infidelity and accused her of neglecting their child. He said that he had Kendyl followed and learned that she was visiting areas associated with high drug trafficking.

¶9. Myrick contacted the MHSP to complain about the harassing text messages and emails that Carl had sent to him and others, including Kendyl. Based on this complaint, on March 1, 2017, Major Jimmy Herzog from the MBI appointed Captain LeCarus D. Oliver to investigate the allegations. Oliver met with Myrick to gather more information. Following this meeting, Myrick forwarded Oliver the email Carl had sent to him in addition to several of the texts between Carl and Kendyl.

¶10. Oliver also interviewed Krystle Goforth, a friend of Kendyl's, who provided Oliver with a text that she had received from Carl that was sent from his State-issued cell phone. In it Carl accused her of helping Kendyl to engage in her illicit affairs. He detailed what his investigator had learned, how some man picked Kendyl up at the library, and how she went somewhere with this man until one in the morning. According to the message, Kendyl then went to a drug neighborhood for an hour. Carl told Goforth that he was a criminal investigator and that he intended to make sure that everyone who helped Kendyl "pays for it." He stated, "I will not rest until I find out everything that she has been doing. And if I have to take you down in the process, so be it." Goforth told Oliver that she felt threatened by Carl.

¶11. Carl and Kendyl divorced in May 2017 while Carl was still in Virginia. However,

4

they continued to have contact thereafter, including texts from Carl that Kendyl felt were harassing. Carl continued posting troublesome messages on social media directed toward Kendyl.

¶12. On May 25, 2017, Kendyl filed charges against Carl in the Justice Court of Attala County, Mississippi, for telephone harassment. The affidavit for these charges signed by Kendyl stated that Carl "did wilfully and unlawfully by means of telecommunication make obscene, lewd, harassing, and profane language with intent to abuse, threaten, and harass a party to a telephone conversation from October 2016 to May 2017."

¶13. Kendyl told Carl about the justice-court charges that she had filed while he was driving to Mississippi to visit her and the children for the weekend. Prior to his arrival, Carl talked to an investigator from the Attala County Sheriff's Department who told him to go to the sheriff's department and that he would be allowed to bond out. But upon his arrival, Carl was arrested and detained at the Leake County Jail for twenty-four hours.

¶14. After this, Carl texted Kendyl, threatening to file charges against her for keying his truck if she did not drop the charges she had filed against him. He told her that she could face a year in jail and have to pay back $5,500 in damages, "so just keep that in mind in case you are thinking about not dropping the charges. I'm not wanting to hurt you in anyway, but if you continue to try to hurt me in my career, then I will have to follow through with those charges." Kendyl filed additional charges against Carl for these harassing communications as well.[3]

---

[3] On October 4, 2017, an arrest warrant was issued for Carl by the Justice Court of Attala County for additional telephone harassment charges. However, Carl was not arrested

5

¶15. Shortly after their divorce, Kendyl went to a rehabilitation center in Navarre, Florida, for treatment of her Adderall addiction. During her three-week stay at the center, Carl filed a petition in chancery court to obtain custody of his daughter. The petition was granted, and Carl was awarded custody of K.S. in July 2017. After Carl obtained custody of K.S., he brought her from Mississippi to live with him in Virginia.

¶16. After completing rehab, Kendyl returned to Mississippi. Although she still struggled with her addiction issues upon her return, Kendyl said she managed to completely end this habit by November 2017. The couple reconciled, and Kendyl returned to Virginia to live with Carl.

¶17. Carl's National Guard deployment ended on December 31, 2017, and the family returned to Mississippi. Carl and Kendyl remarried on January 23, 2018. During their remarriage, another child was born on November 13, 2018.

¶18. While the justice-court charges were pending, Oliver continued his investigation of Myrick's complaint. Carl was instructed to surrender his State-issued cell phone,[4] from which another MBI agent, Captain Carl P. Green, extracted data. Oliver confirmed that some of the messages had been sent from Carl's State-issued cell phone. He also learned that the SIM card had been removed or exchanged with another SIM card at some point. MBI personnel were not allowed to switch SIM cards in their State-issued phones. Carl later

for these additional charges. The record contains no information on the outcome of these charges.

[4] The directive was issued by Anthony Schmidt from the MDPS Legal Division on January 3, 2018, ten months after the MBI began investigating Carl. Carl was also ordered to surrender his State-issued laptop.

admitted that he had taken the SIM card out of the State-issued phone to temporarily replace it with Kendyl's SIM card because her phone had not been working at the time. Carl did not produce the laptop as ordered, saying that it was in his personal storage and that he had no possession of it. However, the letter ordering Carl to produce the laptop specifically stated that if he had a problem retrieving the laptop from storage to notify MDPS, and it would assist Carl in obtaining it.

¶19. Oliver also obtained the justice-court charges and supporting materials (copies of the texts and posts) and documents related to Carl's arrest and conviction, along with the text messages that Carl sent Kendyl following his arrest on those charges. Oliver prepared and submitted a report of his investigation to his superiors.

¶20. On January 11, 2018, MBI sent Carl a "Notice Letter" with an attached "Narrative Statement of Charges," citing him for violating his duties as an employee. The letter notified him of the date of a hearing at which the validity of the charges against him would be determined. The "Narrative Statement of Charges" outlined four different Group III offenses that MBI contended that Carl had violated. These offenses included:

1.   Group III, #12. Unauthorized use or misuse of State property or records.

2.   Group III, #13. An act or acts of conduct, including, but not limited to, the arrest or conviction for a felony or misdemeanor, occurring on or off the job which are plainly related to job performance and are of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to the public or other State employees.

3.   Group III, #14. An act or acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that

7

to continue the employee in the assigned position could constitute negligence in regard to the  agency's duties to the public or other State employees.

4.	Group III, #19.  Willful violation of [Mississippi State Personnel Board (MSPB)] policies and procedures, including, but not limited to: creating or participating in discrimination in the workplace or a hostile work environment; refusing to cooperate and/or giving a false statement in an investigation of possible violation of MSPB policies and procedures.

The notice included a "Facts" section, which read:

In May of 2017, [Master Sergeant (MSGT)] Smith was charged and arrested for cyberstalking and telephone harassment by the Attala County Sheriffs Department.  An internal Affairs investigation revealed that MSGT Smith sent some of these harassing messages from his State issued cell phone and possibly from his State issued laptop.  In October, 2017, subsequent to his May, 2017 arrest, an arrest warrant was issued MSGT Smith for additional telephone harassment charges. MSGT Smith was served and arrested in early January, 2018 for these additional charges. The aforementioned criminal charges are pending against MSGT Smith for his continuing harassing behavior.

As part of MDPS' investigation, on January 3, 2018, MSGT Smith was instructed to turn in his cellphone and laptop to his supervisor or Internal Affairs within five (5) days in effort to cooperate with their investigation or additional charges would be brought.

MSGT Smith failed to cooperate and has not turned in his laptop to this date. Based upon the above it is very evident MSGT Smith's behavior constituted violations of MSPB Group #12, #13, #14, and #19 Offenses as referenced in the Narrative Statement of Charges.

¶21.	Carl's MHSP/MDPS hearing convened on February 21, 2018.  There is no transcript of this proceeding in the record, but after the hearing, the director of the MHSP entered a "Special Order" terminating Carl.  The order noted that Carl had been served with the "Narrative Statement of Charge" and advised of his right to a disciplinary hearing, which Carl elected to have.  The order then stated:

8

At the conclusion of the hearing after all parties presented their case and witnesses, the Hearing Officer determined a founded basis for violation of MSPB Policy Group III #12, #13, and #14 offenses. After reviewing the facts and documentation as presented above I have determined that there is good cause for the following disciplinary decision, to wit:

• Your employment is terminated effective immediately.

The order included a notice to Carl of his right to appeal the termination decision to the MEAB.

¶22.    Carl filed his appeal to the MEAB on March 9, 2018. In it he requested full reinstatement of his employment to the position he held at the time of the termination. On August 7, 2018, the MEAB set the matter for hearing on October 24, 2018. Following this notice, the MDPS submitted a witness list identifying those who would testify at the hearing. These witnesses included Oliver, Captain Carl P. Green, Lieutenant Roger E. Moore, and Master Sergeant Matthew P. Hale. At Carl's request, the MEAB continued the hearing and reset it for March 29, 2019.

¶23.    Meanwhile, Kendyl tried to drop the May 2017 justice-court charges that she filed against Carl. After Carl was found guilty of these charges in the Attala County Justice Court, he appealed his conviction to the Attala County Circuit Court. On March 14, 2019, the circuit court met with the parties and questioned Kendyl, who wanted the charges dismissed. After determining that Kendyl's decision was knowingly and intelligently made and that no threats of physical violence had been made toward her, the circuit court dismissed the charges against Carl. Thereafter, a formal order of dismissal was entered on April 12, 2019.

¶24.    At the March 29, 2019 MEAB hearing, Oliver, Carl, and Kendyl testified to the facts

9

set out above, including the circuit court's dismissal of the charges against Carl. Additionally, Oliver testified that employees did occasionally use their State-issued phones for personal calls but "not to break the law." He further testified:

> Q. All right. Let's go to Group 3, number 14, where it says: "An act or act of conduct occurring on or off the job which are plainly related to job performance and are of such a nature that to continue, the employee in the assigned position would constitute negligence in regard to the Agency's duties to the public or other state employees." Did you conclude whether your investigation confirmed or denied that charge?
>
> A. Confirm.
>
> Q. And how was it confirmed?
>
> A. Well, just by the nature of the text messages, the threats to Mr. Myrick and their family, the threat to Crystal Goforth.
>
> Q. What is the difference between the threats that were made to Crystal Goforth versus the threats or messages that were sent to Kendyl Smith?
>
> A. Kendyl was his wife. They were going through -- like I said, it appears that they were going through a rough patch in their relationship. And Crystal Goforth, she was just a citizen, and he used his State cell phone to threaten a citizen by telling her that he was a criminal investigator, and he wanted to make sure that she should pay for helping Kendyl conduct her whoring around.

Exhibits entered included the "Narrative Statement of Charges," the special order terminating Carl's employment, the justice-court arrest warrant with Kendyl's affidavit, Oliver's statement, messages sent from the State-issued phone, messages sent from other sources, the email chain from Carl to Kendyl's family, additional messages sent by Carl, the circuit court order dismissing the harassment charges against Carl, and the directive requesting Carl to surrender his State-issued cell phone and laptop. After the hearing, counsel for Carl

submitted a hearing memorandum to the MEAB on April 29, 2019.

¶25. The MEAB hearing officer issued an order on May 20, 2019. It pointed out that Carl had been represented by counsel at the hearing before the MEAB and identified the three Group III offenses used as the basis for Carl's termination. The hearing officer recognized that the genesis of events leading to Carl's termination were arguments he had with his wife via text and messages on social media such as Facebook. These formed the basis of the charges of telephone harassment in justice court for which Carl was convicted. The hearing officer said that it was "well settled law under the Mississippi State Personnel Board's Policy and Procedure Manual that state employees can be terminated for being charged, arrested or convicted of misdemeanor or felony charges." Although Carl was ultimately successful in getting the underlying charges dismissed in his appeal to circuit court, the hearing officer said the dismissal of the charges did not in any way affect the MDPS's decision to terminate Carl for the very serious improper Group III offenses: "The fact that he was charged with the aforementioned crimes is enough to terminate [Carl]." The hearing officer further found:

> [T]he fact remains that [Carl] did indeed engage in conduct during the course of his relationship with Kendyl Smith that led to his being charged with a number of very serious Group III offenses. No evidence was really presented at the hearing to refute the charges against Smith concerning the things he did while he was employed with DPS.

The hearing officer affirmed the MHSP's decision and stated that Carl did indeed engage in conduct that led to his being charged with a number of very serious Group III offenses.

¶26. Carl appealed the MEAB order to the Hinds County Circuit Court on June 14, 2019. After briefing and argument, on December 11, 2020, the circuit court entered an order

11

affirming the decision of the MEAB, finding that substantial evidence "did exist" and was "presented to support the decision of the [M]EAB." Carl appealed from the circuit court decision on January 4, 2021.

¶27.    On appeal, Carl argues the following issues:[5]

1.    Whether his termination violated Employee Appeals Board Rule 9.3 and Carl's procedural and substantive due-process rights;[6]

2.    Whether interpersonal, unpublished communications between him and Kendyl can support cause for termination; and

3.    Whether uncorroborated hearsay can support his termination.

**Standard of Review**

¶28.    The scope of judicial review for administrative agency decisions is limited. The court reviewing an agency decision must affirm if "the decision was (1) supported by substantial evidence; (2) not arbitrary or capricious; (3) within the scope or power of the agency; and (4) not a violation of the aggrieved party's constitutional or statutory rights." *Miss. Dep't of Pub. Safety v. Smith*, 243 So. 3d 172, 174 (¶9) (Miss. 2018) (quoting *Ray v. Miss. Dep't of Pub. Safety*, 172 So. 3d 182, 187 (¶15) (Miss. 2015)). The reviewing court may not substitute its judgment for that of the agency or reweigh the facts of the case. *Alston v. Miss. Dep't of Empt. Sec.*, 247 So. 3d 303, 308 (¶18) (Miss. Ct. App. 2017). "A rebuttable presumption

---

[5] In the "Statement of Issues" portion of his brief, Carl lists eight issues, but he only argues three. Because Carl did not present any argument or authority for the other five, we will not address them. "Generally, a party's failure to cite any authority in support of an argument precludes this Court from addressing that argument on appeal." *Hale v. State*, 191 So. 3d 719, 724 n.1 (Miss. 2016).

[6] Carl clarifies in his argument that the rule he claims was violated is a rule in the Mississippi State Personnel Policy and Procedures manual.

exists in favor of the action of an administrative agency, and the burden of proof is on the party challenging an agency's action." *Pub. Emps.' Ret. Sys. v. Marquez*, 774 So. 2d 421, 425 (¶11) (Miss. 2000). This Court applies the same standard of review as the circuit court. *Id*. at 429 (¶32).

**Discussion**

**I.**     **Whether Carl's termination violated Mississippi State Personnel Board Rule 9.3 and Carl's substantive and procedural due-process rights.**

¶29. Carl contends that his substantive and procedural due-process rights were violated because he had no notice of the reasons the hearing officer ultimately relied upon for his termination. Carl also contends that his rights under MSPB Rule 9.3 were violated. MDPS counters that Carl was provided the necessary notice and due process under the law and rules.

*A.*     *Constitutional Substantive and Procedural Due Process*

¶30. "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). If a public employee has a property right to continued employment, the State cannot deprive him or her of this property without due process. *Id*. at 538. Thus, the Court is tasked with determining (1) "whether the claimant possesses a constitutionally protected 'life, liberty or property interest,'" and if the claimant has such interest, (2) "'what process is required' before he may be deprived of that interest." *Fisher v. Jackson Cnty. Sheriff's Dep't*, 328 So. 3d 704, 714 (¶27) (Miss. Ct. App. 2021) (quoting *Burleson v. Hancock Cnty. Sheriff's Dep't Civil Serv.*

13

*Comm'n,* 872 So. 2d 43, 49 (¶16) (Miss. Ct. App. 2003)). In *Ray v. Mississippi Department of Public Safety*, which dealt with the termination of a MSHP employee, the Mississippi Supreme Court held that "agency actions must provide minimum procedural due process, which requires (1) notice and (2) an opportunity to be heard." *Ray*, 172 So. 3d at 190 (¶31).

¶31. "Notice is effective if the employee receives an oral or written explanation of the charges against [him or] her." *Harris v. Miss.Valley State Univ.*, 873 So. 2d 970, 985 (¶40) (Miss. 2004). The opportunity to be heard is satisfied if the employee is given a pre-termination and post-termination hearing because these provide sufficient opportunities to be heard before and after the property interest at stake is taken away. *Ray*, 172 So. 3d at 191 (¶32). In summary, when an employee is afforded adequate notice and an opportunity to be heard, this is "sufficient to satisfy his procedural due process rights." *Id.* at (¶33).

¶32. Substantive due process guarantees that an individual's liberty is not infringed upon by "certain government actions regardless of the fairness of procedures used to implement them." *Harris*, 873 So. 2d at 984 (¶36) (quoting *Hall v. Bd. of Trustees of State Insts. of Higher Learning*, 712 So. 2d 312, 318 (¶24) (Miss. 1998)). A plaintiff claiming that his substantive due-process rights have been violated must be able to show that the deprivation of their "property [or liberty] interest was arbitrary or not reasonably related to a legitimate governmental interest" in order to recover. *Id.* at (¶37) (quoting *Hall,* 712 So. 2d at 319 (¶26)). Essentially, in making the decision to deprive an individual of his protected property interest, public officials must "exercise judgment in a nonarbitrary manner." *Id.* at 985 (¶37) (citing *Bluitt v. Houston Indep. Sch. Dist.*, 236 F. Supp. 2d 703, 731 (S.D. Tex. 2002)).

### B. Due-process Rights under MSPB Rule 9.3

¶33. The due-process afforded to state employees under MSPB Rule 9.3 is similar to the due-process rights under the constitution. An employee who is dismissed or adversely affected must be provided written notice and a fundamentally fair hearing in accordance with the "rules and regulations of the State Personnel Board complying with due process of law." Miss. Code Ann. § 25-9-127(1) (Rev. 2018). The MSPB's Policy and Procedures manual requires the pre-hearing and post-hearing written notices to include the reason(s) for the proposed and final disciplinary action. Miss. State Pers. Bd. Pol'y & Proc. Manual, R. 9.3A (2019). The manual also requires that these notices "be specific by setting forth the particular group offense(s) violated and the charge(s) or ground(s) upon which the disciplinary action is predicated." *Id.* It additionally mandates that the employee be given an opportunity to respond to these notices and that notice must be "presented to the employee at least seven (7) working days prior to the conference." *Id.* at R. 9.3. Finally, the reason(s) listed in the notices should be the only one(s) addressed "throughout the entire appeals process." *Id.* at R. 9.3A.

### C. Carl's Alleged Due-process Violations

¶34. Applying these rules and precedents, we find that Carl's due-process rights were not violated. Carl was personally given a notice letter on January 11, 2018, by Lieutenant Roger Moore of the MBI. The notice letter formally notified Carl of the personnel policy violations the agency contended he had committed. The "Narrative Statement of Charges" identified the particular group offense violated and a factual statement of the conduct that supported

15

the alleged violations. Carl was informed in the notice letter that a disciplinary hearing had been scheduled for February 6, 2018, to determine the validity of the charges filed against him. This written notice was presented to Carl "at least seven (7) working days prior" to the disciplinary hearing and thereby gave Carl adequate time to respond. Although there is no transcript of the pre-termination hearing on the record, there are several references in the MEAB hearing transcript showing that Carl was represented by counsel at the MHSP hearing and that he was given the opportunity to testify and present witnesses. Carl was given a second opportunity to prove his case before the MEAB, where again he was represented by counsel and given an opportunity to be heard and present witnesses. Thus, Carl was afforded adequate procedural due process of law.

¶35. Carl's only due-process-violation argument concerns the substance of the notice he was given. He claims that it contained only two underlying facts to support the offenses charged, namely, that he had criminal charges pending for alleged telephone harassment and that he failed to turn in his cell phone or laptop. However, the "Facts" portion of the "Narrative Statement of Charges" said that the offending conduct was not that Carl had criminal charges *pending*, but that he had been *arrested and charged* with cyberstalking and telephone harassment, which is a Group III #13 offense. The "Facts" also said that "an Internal Affairs investigation revealed that MSGT Smith sent some of these harassing messages from his state issued cell phone and possibly from his state issued laptop." This fact supported the Group III #12 offense of unauthorized use or misuse of State property or records. So Carl was also given notice of a charge of misuse of his State-issued cell phone.

16

While the "Narrative Statement of Charges" did not directly link each of the Group offenses set out with the facts specifically, or particularly, the factual statement nevertheless provided a factual basis for each offense listed.

¶36. The MEAB order affirming Carl's termination contained a summary of the facts that led to Carl's termination and noted that Carl was unable to present any evidence to refute the charges against him set forth in the "Narrative Statement of Charges." The MEAB heard testimony and was presented documents to review. It is the MEAB decision that we examine to determine whether it was supported by substantial evidence. *Bynum v. Miss. Dep't of Educ.*, 906 So. 2d 81, 91 (¶17) (Miss. Ct. App. 2004). "Because it is the decision of the EAB that is under appellate review, if that decision is supported by substantial evidence, we may not interfere even if, viewed another way, the evidence would have provided substantial support for the opposite outcome." *Id.* A review of the MEAB hearing transcript and exhibits substantiates the MEAB's findings. Oliver's investigation revealed proof that Carl used his State-issued phone to make several of the harassing text messages, which were entered into evidence. These included Carl's threats to a third party, Goforth, using his position as an investigator. The text messages indisputably proved this, and Carl did not deny any of his behavior. In addition, documents showed Carl had been arrested for making these harassing calls. Carl did not dispute this, although he pointed out that on appeal, the charges were dismissed.

¶37. Carl cites *Bynum, supra,* to support his due-process notice argument, but *Bynum* is factually distinguishable in many respects and is not applicable to this case. In *Bynum*, this

17

Court held that Bynum was not afforded proper notice of one of the grounds for her termination because she *first* received notice of the challenged ground *in her termination letter*. *Id.* at 105 (¶85). Thus, she had no opportunity to raise a defense prior to her termination. *Id.* Here Carl was given notice of all the reasons relied on for his termination before his pre-termination hearing, and both that hearing officer and the MEAB hearing officer found merit to most of them.

¶38. Carl also argues that the facts about his arrest, which supports the Group III #13 and #14 offenses, have been rendered moot because the charges against him in justice court were later dismissed by the circuit court. However, the Group III #13 offense is not limited to *convictions* for acts or conduct constituting a felony or misdemeanor. According to MDPS policies, discipline for Group III offenses can be based on merely being *arrested* for such crimes. Carl did not argue that termination for a single arrest violated his due-process rights; he only argued that the ultimate dismissal of the charges absolved him. Moreover, Carl was terminated for more than just his arrest. He misused his State-issued cell phone to threaten his wife and others, which is a significant violation of MDPS policy.

¶39. Carl also argues that because the hearing officer dismissed the MDPS Group III #19 offense, failing to cooperate in an investigation when he did not produce his laptop, he should not have been terminated. But this argument is irrelevant because our examination focuses on whether the record substantially supports the reasons that the MEAB did find justified his termination, not those that were dismissed.

¶40. In light of the preceding, we find that Carl's procedural due-process rights of notice

and an opportunity to be heard were adequately protected. Moreover, as discussed below, Carl's termination for just cause was supported by substantial evidence and thus was not arbitrary. Consequently, there was no violation of Carl's substantive due-process rights.

## II. Whether interpersonal, unpublished communications between Carl and Kendyl can support cause for termination.

¶41. Carl next argues that there was no good cause for his termination, claiming that "interpersonal, unpublished communications" between him and his wife could not, and did not, support his termination. MDPS responds that there was ample evidence, including these communications and other conduct that constituted good cause for Carl's termination and that Carl failed to meet his burden of rebutting the evidence presented against him.

¶42. Any department, agency, or institution that dismisses a state employee is required to show that the dismissal was a result of inefficiency on the employee's part or was based on other good cause. Miss. Code Ann. § 25-9-127(1). Good-cause determination is guided by the particular facts and circumstances of each case and is found to exist upon a finding of substantial evidence. *Ray*, 172 So. 3d at 187 (¶¶15-16). Our role is to determine whether there was "substantial (that is, more than a scintilla of) evidence" for the MEAB hearing officer to conclude that there was good cause for Carl's termination. *Id.* at (¶16). Substantial evidence is evidence that "affords a substantial basis of fact from which the fact in issue can be reasonably inferred." *Id.* (quoting *State Oil & Gas Bd. v. Miss. Mineral & Royalty Owners Ass'n*, 258 So. 2d 767, 769 (Miss. 1971)).

¶43. This Court has upheld termination for good cause in numerous cases after reviewing the record and finding the termination substantially supported by the evidence. *See Ray*,

19

*supra* (holding good cause existed for the termination of a highway patrol employee for falsifying or writing invalid tickets to increase his ticket activity); *Miss. Bureau of Narcotics v. Stacy*, 817 So. 2d 523, 528 (¶¶16, 18) (Miss. 2002) (holding that there was substantial evidence to support the good-cause termination of an employee after an altercation with his in-laws that resulted in a conviction for simple assault); *Wilburn v. Miss. Highway Safety Patrol*, 795 So. 2d 575, 578 (¶15) (Miss. Ct. App. 2001) (affirming the termination of a highway patrol employee for falsifying records and writing additional false citations for drivers that resulted in unpaid fines when he neglected to seek dismissal of these fake citations). In other cases, after a similar review the appellate court has reversed an MEAB finding if not supported by the record. *See Richards v. Miss. Dep't of Pub. Safety*, 318 So. 3d 1150, 1153 (¶2) (Miss. Ct. App. 2020) (reversing the MEAB's finding that there was no substantial evidence to support a highway patrol employee's termination for allegedly reporting to work while under the influence of controlled substances).

¶44.    Here, Carl argues that unpublished communications between him and his wife cannot constitute cause for termination. But he cites no authority for the exclusion of private interspousal communications as grounds for termination, especially when it is repeated and done with the use of a State-issued phone. Rather, Carl argues that the MDPS had no policy against the use of foul language outside the work place. As support, he cites an unemployment-benefits case where this Court held that the defendant's use of foul language against another worker did not amount to misconduct because his conduct was an "isolated incident of poor judgment." *SkyHawke Techs. LLC v. Miss. Dep't of Empl. Sec.*, 110 So. 3d

327, 331 (¶14) (Miss. Ct. App. 2012). However, the facts in *SkyHawke* are clearly distinguishable from the facts of this case. In *SkyHawke,* the defendant used his personal phone to send a coworker "vulgar text messages" in retaliation after a coworker "called him an obscene name." *Id.* at 329 (¶2). In holding that there was insufficient proof of misconduct, the Court noted the defendant's testimony that he was "unaware of any policy against the use of foul language," that this was a single isolated incident, and that the rule was not "fairly and consistently enforced." *Id.* at 331 (¶14). In this case, Carl sent multiple harassing text messages to his wife and others, often using his State-issued phone, in direct violation of MDPS policy. It was not an isolated incident but continued for months, upsetting not only his wife but his family and friends. Clearly, *SkyHawke* is inapplicable.

¶45. Moreover, phone calls and texts formed the basis for one of the reasons for Carl's termination—his arrest for misdemeanor telephonic harassment. For the undisputed fact of his arrest, and the undisputed proof of Carl's misuse of his State-issued cell phone in making the calls and sending the texts, the MDPS terminated him. The later dismissal of the telephone harassment charges in no way erased the fact that Carl had been arrested for these charges and that he had misused his State-issued cell phone.

¶46. After a review of the record, we find that there was substantial evidence to support the MEAB's finding that there was good cause for Carl's termination. Hence, the MEAB's decision to affirm MDPS's action was not arbitrary and capricious.

### III. Whether uncorroborated hearsay can support Carl's termination.

¶47. Carl argues that the record consists of uncorroborated hearsay and refers to Oliver's

21

testimony about conversations with Kendyl in which she said she was afraid of Carl. The hearing officer did not include this testimony or Kendyl's alleged fear of Carl as a basis for Carl's termination. To the contrary, the record contains the numerous texts and emails that Carl admitted he sent. These constitute nonhearsay evidence that supports the MEAB's findings. Moreover, Carl made no objection during the MEAB hearing to the admission of Oliver's testimony concerning Kendyl's communications to him. Consequently, Carl waived his right to challenge it now on appeal. *See Carr v. State,* 873 So. 2d 991, 1004 (¶35) (Miss. 2004) (stating that counsel must object to any evidence in order to preserve his challenge on appeal). Therefore, Carl's argument concerning the MEAB's alleged reliance on uncorroborated hearsay to affirm his termination is without merit.

**Conclusion**

¶48. Because Carl was provided notice of the charges against him and an opportunity to be heard on those charges, we find no merit to Carl's claim of violations of his procedural due process. Nor was there any violation of Carl's substantive due-process rights or rights under MSPB Rule 9.3 because the MEAB's decision of just cause for the termination was supported by substantial evidence and was not arbitrary. Carl's claims that he was terminated because of communications with his wife and that the MEAB decision was based on uncorroborated hearsay are also without merit. Therefore, we affirm the circuit court's decision.

¶49. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ.,**

22

**CONCUR.**